Sandra SEEGARS, et al., Plaintiffs,

v.

John D. ASHCROFT, Attorney General of the United States, et al., Defendants.

No. CIV.A.03–834(RBW).

United States District Court, District of Columbia.

Jan. 14, 2004.

Richard E. Gardiner, Stephen Porter Halbrook, Fairfax, VA, for Plaintiffs.

Daniel Meron, Terry Marcus Henry, United States Department of Justice, Daniel Albert Rezneck, Office of Corporation Counsel for the District of Columbia, Washington, DC, for Defendants.

Eric Mogilnicki, Jr., Wilmer, Cutler & Pickering, Adam Charles Sloane, David M. Gossett, Mayer, Brown, Rowe & Maw, for Amicus.

### *MEMORANDUM OPINION*

WALTON, District Judge.

The plaintiffs, five residents of the District of Columbia, have filed a complaint with this Court seeking "to vindicate the rights of residents of the District of Columbia to exercise the same rights accorded to American citizens in every State of the Union to keep and bear arms under the Second Amendment to the United States Constitution, which [the plaintiffs allege] guarantees the right of law-abiding citizens to keep handguns in the home for lawful defense of their families and other lawful purposes." Complaint ("Compl.") ¶ 1. The defendants, John D. Ashcroft, the Attorney General of the United States ("Attorney General"), and Anthony A. Williams, the Mayor of the District of Columbia ("Mayor"), have both filed motions to dismiss the plaintiffs' complaint. The Attorney General asserts that because "[p]laintiffs have neither been prosecuted nor threatened with prosecution under the [challenged] statutes, nor have they even sought to obtain registration or licensing under the statutes[,]" they lack standing to pursue their claims and this case is therefore not ripe for review. Motion to Dismiss of Defendant Attorney General of the United States and Memorandum of Law in Support Thereof ("Att'y Gen.'s Mot.") at 1–3. The Mayor, on the other hand, asserts that the plaintiffs have failed to state a claim upon which relief can be granted because, among other reasons, the Second Amendment does not guarantee individuals a constitutional right to possess firearms.[1] Defendant Anthony A. Williams' Motion to Dismiss the Complaint, Memorandum of Points and Authorities in Support of Defendant Williams' Motion to Dismiss the Complaint ("Mayor's Mot.") at 1–6. Upon consideration of the parties' written submissions, the oral arguments of counsel,[2] and for the reasons set forth below, the Court finds that the plaintiffs' claims challenging the District of Columbia's statutes prohibiting

---

1. The Court notes that the Mayor has "adopt[ed] and incorporate[d] by reference the argument[s] of the defendant Ashcroft as to the plaintiffs' lack of standing and the lack of ripeness and nonjusticiability of the plaintiffs' claims." *See* Reply of Defendant Williams to Plaintiffs' Opposition to Defen-

dant's Motion to Dismiss ("Mayor's Reply") at 1.

2. On October 8, 2003, this Court heard oral argument on the defendants' motions to dismiss.

the possession of pistols are non-justiciable and therefore must be dismissed. However, the Court finds that plaintiff Gardine Hailes' challenges to the District of Columbia statute which requires that she keep her shotgun either unloaded, disassembled or bound by a trigger lock are legally distinct from the plaintiffs' challenges to the District of Columbia's statutes prohibiting the possession of pistols. Thus, the Court must consider whether Ms. Hailes has a viable Second Amendment claim. For the reasons outlined below, the Court concludes that the plaintiff is unable to maintain a Second Amendment challenge to the requirement regarding how she must maintain her legally possessed firearm, and, in any event, the Second Amendment does not apply to the District of Columbia. Accordingly, Ms. Hailes' challenges must also be dismissed.

## I. *Factual Background*

As mentioned above, the plaintiffs are all resident of the District of Columbia. Plaintiff Sandra Seegars is a Commissioner of the District of Columbia Taxicab Commission and an elected Advisory Neighborhood Commissioner. Compl. ¶ 22. Ms. Seegars allegedly "resides in a high crime neighborhood, has been a crime victim, and wishes to obtain a pistol to defend herself in her home." *Id.* Plaintiff Gardine Hailes is an office manager and a former television show host who "currently possesses in her home a registered shotgun which she keeps bound by a trigger lock." Compl. ¶ 23. According to Ms. Hailes, her home and her neighbor's home have been burglarized and she wishes to "remove the trigger lock when she deems it necessary to defend herself in her home . . . [and] also wishes to obtain a pistol to

defend herself in her home." *Id.* Plaintiff Absalom F. Jordan, Jr., is an elected Advisory Neighborhood Commissioner and a National Rifle Association Certified Firearms Instructor. Compl. ¶ 24. Mr. Jordan purportedly "is a victim of [an] attempted armed robbery[,] . . . [lives in] a major drug area[, and] is involved in efforts to expel drug dealers from [his] neighborhood." *Id.* Mr. Jordan also wishes to obtain a pistol "and keep it at his residence for self protection." *Id.* Plaintiff Carmela B. Brown is a writer and an actor and claims that she "resides in a high crime neighborhood rife with open-air drug trafficking and prostitution, and wishes to obtain a pistol to defend herself in her home." Compl. ¶ 25. Finally, plaintiff Robert N. Hemphill is a retired postman and "wishes to obtain a pistol to defend himself in his home." Compl. ¶ 26.

The barrier to the plaintiffs' desires to legally possess pistols in the District of Columbia is section 7–2502.01 of the District of Columbia Code, which prohibits the possession of any firearm within the District of Columbia "unless the person or organization holds a valid registration certificate for the firearm." [3] D.C.Code § 7–2502.01 (2001). Firearm registration certificates, which may be issued under this statute to organizations involved in law enforcement, are not necessary for: (1) individuals involved in law enforcement or the armed forces while on duty, (2) a licensed dealer if such a firearm is acquired and kept with respect to that business, and (3) any nonresident of the District of Columbia "participating in any lawful recreational firearm-related activity in the District . . . ." *Id.* Furthermore, and of particular importance in this case, section

---

**3.** In addition, District of Columbia Code § 7–2502.03 "prohibits the issuance of registration certificates to criminals, minors, and various individuals with mental or physical dis-abilities or addictions that might affect the person's suitability for safe and responsible possession of a firearm." Att'y Gen.'s Mot. at 4 (citing D.C.Code § 7–2502.03).

7–2502.02 of the District of Columbia Code states that "[a] registration certificate shall not be issued for a ... [p]istol not validly registered to the current registrant in the District prior to September 24, 1976 ...." D.C.Code § 7–2502.02 (2001). If the Chief of Police determines "that an application for a registration certificate should be denied ... [he] shall notify the applicant ... of the proposed denial ..., briefly stating the reason or reasons therefor." D.C.Code § 7–2502.10 (2001). A notice of the denial must then be served on the applicant, who

> shall have 15 days from the date the notice is served in which to submit further evidence in support of the application ...; provided, that if the applicant does not make such a submission within 15 days from the date of service, the applicant ... shall be deemed to have conceded the validity of the reason or reasons stated in the notice, and the denial of revocation shall become final.

*Id.* If the applicant timely submits further evidence in support of the application, the Chief of Police has ten days to serve upon the applicant a notice of his final decision. *Id.*

> The Chief's decision shall become effective at the expiration of the time within which to file a notice of appeal pursuant to the District of Columbia Administrative Procedure Act ... or, if such a notice of appeal is filed, at the time the final order or judgment of the District of Columbia Court of Appeals becomes effective.

*Id.* The prohibition against carrying firearms is set forth in Title 22 of the District of Columbia Code. Section 22–4504(a) of the Code provides, in part, that:

No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license pursuant to District of Columbia law .... Whoever violates this section shall be punished as provided in § 22–4515, except that:

> (1) A person who violates this section by carrying a pistol, without a license issued pursuant to District of Columbia law, ... in a place other than the person's dwelling place, place of business, or on other land possessed by the person, shall be fined not more than $5,000 or imprisoned for not more than 5 years, or both .... [4]

D.C.Code § 22–4504(a) (2001). Section 22–4515 of the District of Columbia Code provides: "Any violation of any provision of this chapter for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than 1 year, or both." D.C.Code § 22–4515 (2001).

The plaintiffs also challenge District of Columbia Code § 7–2507.02, which provides that "each registrant shall keep any firearm in his possession unloaded and disassembled or bound by a trigger lock or similar device unless such firearm is kept at his place of business, or while being used for lawful recreational purposes within the District of Columbia." D.C.Code § 7–2507.02 (2001). A violation of D.C.Code § 7–2507.02 is punishable by imprisonment for up to one year and a fine of up to $1,000. *See* D.C.Code § 7–2507.06 (2001).

## II. *Standard of Review*

 Federal Rule of Civil Procedure 12(b)(1) requires the plaintiffs to establish

---

**4.** The potential penalties are doubled if a "violation of this section occurs after a person has been convicted in the District of Columbia of a violation of this section or of a felony, either in the District of Columbia or another jurisdiction ...." D.C.Code § 22–4504(a) (2001).

by a preponderance of the evidence that the court has jurisdiction to entertain their claims. Fed.R.Civ.P. 12(b)(1); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F.Supp.2d 9, 13 (D.D.C.2001) (holding that while the plaintiff has the burden of establishing the court's jurisdiction, the court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."); *Pitney Bowes, Inc. v. United States Postal Serv.*, 27 F.Supp.2d 15, 18 (D.D.C.1998); *Darden v. United States*, 18 Cl.Ct. 855, 859 (Cl.Ct.1989). While the Court must accept as true all the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), because the plaintiffs have the burden of establishing that the Court has jurisdiction, the " 'plaintiff[s'] factual allegations in the complaint ... will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge of Fraternal Order of Police*, 185 F.Supp.2d at 13–14 (citation omitted). Finally, the Court notes that in deciding a 12(b)(1) motion, it is well established in this Circuit that a court is not limited to the allegations in the complaint but may consider material outside of the complaint in an effort to determine whether the court has jurisdiction in the case. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 n. 3 (D.C.Cir.1997); *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C.Cir.1992); *Haase v. Sessions*, 835 F.2d 902, 906 (D.C.Cir.1987); *Hohri v. United States*, 782 F.2d 227, 241 (D.C.Cir. 1986); *Grand Lodge of Fraternal Order of Police*, 185 F.Supp.2d at 14.

### III. *Legal Analysis*

Interestingly, the defendants in this case seek dismissal of the case on two separate and distinct grounds. The Attorney General asserts that the plaintiffs' claims are non-justiciable and this case should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) because the plaintiffs lack standing to challenge the statutory provisions under attack and their claims are not ripe for review. In addition, in a footnote, the Attorney General states:

> [i]t is the position of the United States that the Second Amendment 'protects the rights of individuals, including persons who are not members of any militia or engaged in active military service or training, to possess and bear their own firearms, subject to reasonable restrictions designed to prevent possession by unfit persons or to restrict the possession of types of firearms that are particularly suited to criminal misuse.'

Att'y Gen.'s Mot. at 13 n. 11 (quoting Brief for Respondent in Opposition to Petition for a Writ of Certiorari at 19–20 n. 3, *United States v. Emerson*, 270 F.3d 203 (5th Cir.2001), *cert. denied*, 536 U.S. 907, 122 S.Ct. 2362, 153 L.Ed.2d 184 (2002)). On the other hand, the Mayor seeks dismissal of the plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6) on the ground that the Second Amendment does not guarantee an individual a constitutional right to possess firearms. Mayor's Mot. at 1–6. In *Ex Parte McCardle*, 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1868), the Supreme Court stated that

> [w]ithout jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause. And this is not less clear upon authority than upon principle.

*Id.* at 514. Accordingly, the Court must first determine whether it has jurisdiction to entertain the plaintiffs' challenges.

**(1) *Are the Plaintiffs' Preenforcement Challenges to the District of Columbia Statutes Regulating the Possession and Maintenance of Firearms Justiciable?***

In *Mahorner v. Bush*, 224 F.Supp.2d 48 (D.D.C.2002) (Walton, J.), *aff'd*, No. 02–5335, 2003 WL 349713, at *1 (D.C.Cir.) (per curiam), *cert. denied*, —— U.S. ——, 123 S.Ct. 2654, 156 L.Ed.2d 659 (2003), this Court recently reiterated that:

> [i]t is a fundamental axiom that pursuant to Article III of the Constitution, federal courts are vested with the power of judicial review extending only to 'Cases' and 'Controversies.' U.S. Const. art. III, § 2. As a result of the Constitution's 'case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing[,] ripeness, mootness, and the political question doctrine.'

*Id.* at 49 (quoting *National Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C.Cir.1996) (citing *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984))). In this case, two of these justiciability doctrines are implicated: standing and ripeness.

■ For a plaintiff to have Article III standing to bring a claim in federal court, the plaintiff bears the burden of establishing that he or she has suffered "an (1) 'injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical'—(2) which is 'fairly traceable' to the challenged act, and (3) 'likely' to be 'redressed by a favorable decision.'" *Id.* at 49–50 (quoting *National Treasury Employees*, 101 F.3d at 1427 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992))). However, even if these

requisites for Article III standing are present, a federal court may still deny standing under certain 'prudential' principles. Standing may be denied on prudential grounds, for example, to litigants who present abstract questions of wide public significance that would more appropriately be addressed by the representative branches of government ....

*Navegar, Inc. v. United States*, 103 F.3d 994, 998 (D.C.Cir.1997) (citations omitted). In *Navegar, Inc. v. United States*, the District of Columbia Circuit explained that

> [a] related component of justiciability which is particularly relevant in the context of actions for preenforcement review of statutes is 'ripeness,' which focuses on the timing of the action rather than on the parties seeking to bring it. In deciding whether a case is ripe for adjudication, federal courts generally consider the hardship to the parties of withholding court resolution (a factor that overlaps with the 'injury in fact' facet of [the] standing doctrine), and the fitness of the issues for judicial decision (a factor that resembles the prudential concerns applied in the standing context). By refusing to hear disputes which are not yet ripe, federal courts avoid becoming entangled in 'abstract disagreements,' enhance judicial economy, and ensure that a record adequate to support an informed decision exists when the case is heard.

*Id.* The District of Columbia Circuit also noted that "[f]ederal courts most frequently find preenforcement challenges justiciable when the challenged statutes allegedly 'chill' conduct protected by the First Amendment, but preenforcement challenges have been heard outside of the First Amendment context as well." *Id.* at 999 (citations omitted).

Here, the plaintiffs' claims amount to a preenforcement challenge, as they have

"neither been prosecuted nor threatened with prosecution under the [D.C.] statutes," and, except for one of the plaintiffs,[5] they do not even own a pistol and have never applied for a registration certificate for a pistol under the governing statutes. Att'y Gen.'s Mot. at 1. In *Navegar*, the District of Columbia Circuit stated that

> [e]ven when the criminal statute that a litigant challenges has not yet been enforced against her, the challenger's claim may be justiciable if the challenger can demonstrate that she faces a threat of prosecution under the statute which is *credible and immediate*, and not merely abstract or speculative. In the proper circumstances, such threats of enforcement can simultaneously ripen a preenforcement challenge and give the threatened party standing.

103 F.3d at 998 (emphasis added) (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298–99, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *American Library Ass'n v. Barr*, 956 F.2d 1178, 1196 (D.C.Cir.1992)). This is because

> [a] credible threat of imminent prosecution can injure the threatened party by putting her between a rock and a hard place—absent the availability of preenforcement review, she must either forego possibly lawful activity because of her well-founded fear of prosecution, or willfully violate the statute, thereby subjecting herself to criminal prosecution and punishment.

*Id.* (citing *Babbitt*, 442 U.S. at 298–99, 99 S.Ct. 2301).

The Circuit Court's analysis in *Navegar* is particularly helpful in resolving whether the plaintiffs in this case have standing to assert their preenforcement challenges. In *Navegar*, the plaintiffs challenged certain provisions of the Violent Crime Control and Law Enforcement Act of 1994 ("Crime Control Act"), Pub.L. No. 103–322, 108 Stat. 1796, which proscribed the

> 'manufacture, transfer, or possess[ion of] a semiautomatic assault weapon,' and defined 'semiautomatic assault weapon' to include 'any of the firearms, or copies or duplicates of the firearms in any caliber, known as . . . INTRATECTECT–9, TEC–DC9 and TEC–22; and . . . revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12.'

*Navegar*, 103 F.3d at 997 (quoting 18 U.S.C. §§ 921(a)(30)(A), 922(v)(1)). The Crime Control Act also defines a "semiautomatic weapon" to include "semiautomatic pistols that have 'an ability to accept a detachable magazine' and at least two of five other specified characteristics." *Id.* (quoting 18 U.S.C. § 921(a)(30)(C)). In addition, the Crime Control Act outlaws "the transfer or possession of any 'large capacity ammunition feeding device,' which . . . [is] defined to include ammunition magazines manufactured after the date of enactment of the Act which can hold more than ten rounds of ammunition." *Id.* (citing 18 U.S.C. §§ 921(a)(31), 922(w)(1)). Under the Act, "[u]nits lawfully possessed on the effective date of the Act are 'grandfathered,' meaning they may lawfully be transferred and possessed after the Act's passage." *Id.* (citing 18 U.S.C. §§ 922(v)(2), (w)(2)).

Following the enactment of the Crime Control Act, the plaintiffs, two federally-licensed firearms manufacturers—Navegar, Inc. (doing business as "Intratec") and

---

5. Plaintiff Jordan purportedly owns a pistol that he stores outside of the District of Columbia, Compl. ¶ 24, and has allegedly been denied a license to possess a pistol in the District of Columbia on two separate occasions over twenty-five years ago. *See Jordan v. District of Columbia*, 362 A.2d 114 (D.C.1976); *Jordan v. District of Columbia Bd. of Appeals and Review*, 315 A.2d 153, 155 (D.C.1974).

Penn Arms, Inc.—were visited by agents from the Bureau of Alcohol, Tobacco and Firearms ("ATF")[6] on the same day the Crime Control Act became effective. *Id.* The agents "informed officers of these companies of the prohibitions [contained in the Crime Control Act], and gave notice that they planned to conduct inventories of the weapons that would be 'grandfathered' under the Act. Over the next two days, ATF inspection agents conducted these inventories." *Id.* Ultimately, "the ATF sent a letter to [the plaintiffs] and other firearms manufacturers which summarized the [Act's] prohibitions." *Id.* The district court granted the government's motion for summary judgment, finding that the plaintiffs' "complaint did not set forth a justiciable controversy as required by Article III of the United States Constitution, because the plaintiffs had failed to demonstrate that they faced a genuine 'threat of prosecution.'" *Id.* at 996–97. The Circuit Court separated the appellants' claims into two categories: (1) those claims that challenged portions of the Crime Control Act that refer to specific brand names and models, and (2) those claims that challenged portions of the Crime Control Act that generally identify prohibited materials by characteristics. *Id.* at 999. Addressing the challenge to the Crime Control Act's provisions that refer to specific brand names and models, the *Navegar* Court found that [t]he most important circumstance that the district judge overlooked

> [was] that the Act in effect singles out the appellants as its intended targets, by prohibiting weapons that only the appellants make[, *i.e.,* INTRATECTECT–9, TEC–DC9 and TEC–22; and ... revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12].

*Id.* at 1000. This was significant because "if these provisions of the statute are enforced at all, they will be enforced against these appellants for continuing to manufacture and sell specified weapons ...." *Id.* The Circuit Court went on to comment that

> [t]o conclude that the appellants face no credible threat of prosecution under these portions of the Act, we would have to believe that the government would enact a widely publicized law targeting products that only the appellants make, send its agents to the appellants' facilities on the day of enactment to inform them of the law's prohibitions and to begin quarantining 'grandfathered' units, and soon thereafter remind appellants of the provisions of the Act by letter, but then sit idly by while the appellants continued to manufacture the outlawed weapons. To imagine that the government would conduct itself in so chimerical a fashion would be to declare in effect that federal courts may never, in the absence of an explicit verbal 'threat,' decide preenforcement challenges to criminal statutes. This has never been the law. To require litigants seeking resolution of a dispute that is appropriate for adjudication in federal court to violate the law and subject themselves to criminal prosecution before their challenges may be heard would create incentives that are perverse from the perspective of law enforcement, unfair to the litigants, and totally unrelated to the constitutional or prudential concerns underlying the doctrine of justiciability.

*Id.* at 1000–01.

While the *Navegar* Court found that the appellants had standing to challenge the

---

**6.** The Court notes that the name of the Bureau of Alcohol, Tobacco and Firearms was recently changed to the Bureau of Alcohol, Tobacco, Firearms and Explosives pursuant to the Homeland Security Act, Pub.L. 107–296.

Crime Control Act's provisions that referenced and specifically targeted the weapons manufactured only by the appellants, it also held that the appellants lacked standing to challenge the second category of claims, *i.e.*, those that referred to the generic portions of the Act. *Id.* In this regard, the Court concluded that the threat of prosecution under the generic provisions of the Crime Control Act was "too remote and speculative" because, while

> appellants can point to some of the same circumstances that we found relevant to the justiciability of their challenges to the portions of the Act that name individual weapons, including the high-profile nature of their business and the publicity accorded to the Act, the visits by the ATF agents, and the letter from the ATF[,] . . . they cannot invoke the one factor that we found most significant in our analysis of the other challenges— the statute's own identification of particular products manufactured only by the appellants. In the absence of this factor, the threat of prosecution becomes far less imminent, and these parties' claims to standing concomitantly much weaker. These generic portions of the Act could be enforced against a great number of weapon manufacturers or distributors, and although the government has demonstrated its interest in enforcing the Act generally, nothing in these portions indicates any special priority placed upon preventing these parties from engaging in specified conduct.

*Id.* at 1001–02.

The Circuit Court's opinion in *Navegar* comports with decisions of other circuits. In *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996), a case that also involved a challenge to the Crime Control Act, the Ninth Circuit found that the plaintiffs' alleged injuries were not "actual or imminent" or "concrete and particularized" enough to confer standing. *Id.* at 1127. The plaintiffs—the San Diego County Gun Rights Committee, the San Diego Militia, the president of the San Diego Militia, a licensed federal firearms dealer, and a retired Marine Corps officer—all challenged the Crime Control Act, although none had been prosecuted, arrested or incarcerated for violating the Act. *Id.* at 1124. Most notably for the purposes of this case, the Ninth Circuit concluded that the plaintiffs were unable to bring a preenforcement challenge to the statute because they were unable to show a "*genuine* threat of *imminent* prosecution[.]" *Id.* at 1126 (citations omitted). This was due to the plaintiffs' failure to even "identify a general threat of prosecution made against them. [In fact the p]laintiffs concede[d] that they ha[d] not been threatened with arrest, prosecution or incarceration." *Id.* at 1127. The Ninth Circuit noted that while "[a] specific warning of an intent to prosecute under a criminal statute may suffice to show imminent injury and confer standing[,] . . . a general threat of prosecution is not enough to confer standing." *Id.* (citations omitted). In *San Diego County Gun Rights*, the Ninth Circuit concluded that the "[p]laintiffs [ ] established at most a possibility of their eventual prosecution under the Crime Control Act, which is clearly insufficient to establish a 'case or controversy.'" *Id.* at 1128 (citations omitted). In addition, the Ninth Circuit pointed out that the plaintiffs had "merely assert[ed] that they '*wish and intend* to engage in activities prohibited by [the Act]' . . . [and thus] failed to show the high degree of immediacy that is necessary for standing under these circumstances." *Id.* at 1127 (citing *Lujan*, 504 U.S. at 564–65, 112 S.Ct. 2130) (emphasis added). The *San Diego County Gun Rights* Court also noted that the "existence of a 'chilling effect' . . . has

never been considered a sufficient basis, in and of itself, for prohibiting ... [government] action. The only exception to this general rule has been the relaxed standards for overbreadth facial challenges involving protected speech." *Id.* at 1129 (citations omitted) (alteration in original).

The Sixth Circuit has also addressed a preenforcement challenge to the Crime Control Act. In *National Rifle Association of America v. Magaw*, 132 F.3d 272 (6th Cir.1997), the Sixth Circuit considered s challenge to the Crime Control Act advanced by several groups of plaintiffs, including manufacturers, firearms dealers and individuals.[7] Addressing the manufacturers and firearms dealers first, the *Magaw* Court noted that its decision that these plaintiffs had standing was "consistent with the opinion in the Court of Appeals for the District of Columbia in *Navegar* ...[,]" 132 F.3d at 283, as it found that these plaintiffs "demonstrated sufficient injury-in-fact to confer standing" not only because of economic harm that they would incur with the termination of the manufacturing and sale of the prohibited weapons, *id.* at 281–82, but also because they would face "serious criminal penalties." *Id.* at 283. The *Magaw* Court also found that the plaintiffs' challenge was ripe for review because "actual or imminent enforcement is not always a prerequisite in non-First Amendment cases, if the statute creates a 'present harm,' such as substantial economic injury." *Id.* at 285. Looking to the Supreme Court's decision in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), for guidance, the

Sixth Circuit evaluated the plaintiffs' challenge by examining the "fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* The *Magaw* Court found that it had before it "a classic example of when pre-enforcement review must be granted" not only because of the well-founded fear of prosecution as explained in *Navegar, id.* at 288–90, but also because "[a]bsent the availability of pre-enforcement review, these plaintiffs must either terminate a line of business, make substantial expenditures in order to comply with the Act, or willfully violate the statute and risk serious criminal penalties." *Id.* at 287. Notably, however, the *Magaw* Court found that the individual plaintiffs did not have standing to sue. *Id.* at 293–94. The Sixth Circuit, stating that the economic harm rationale underlying its finding that the manufacturers and dealers had standing was absent with respect to the individual plaintiffs, observed that

[t]he individual plaintiffs aver that they 'desire' and 'wish' to engage in certain possibly prohibited activities, but are 'restrained' and 'inhibited' from doing so. They allege that they 'are unable and unwilling, in light of the serious penalties threatened for violation of the statute, to obtain and possess the firearms and large capacity ammunition feeding devices prohibited by the statute.' Although the standing requirement of an injury-in-fact is fairly lenient and may include a wide variety of economic, aesthetic, environmental, and other harms, the individual plaintiffs herein allege merely that they would like to engage in conduct, which might

---

7. In addition, there were two "nonprofit gun rights associations" that were plaintiffs in *Magaw*. 132 F.3d at 278. The Sixth Circuit dismissed the claims of these associations because they failed to submit declarations or affidavits "alleg[ing] an injury-in-fact sufficient to confer standing in the individual member's own right," and thus lacked standing to sue on their own behalf. *Id.* at 294–95.

be prohibited by the statute, without indicating how they are currently harmed by the prohibitions other than their fear of prosecution. Plaintiffs' assertions that they 'wish' or 'intend' to engage in proscribed conduct is not sufficient to establish an injury-in-fact under Article III. The mere possibility of criminal sanctions applying does not in and of itself create a case or controversy.

*Id.* at 293. (internal quotation marks and citations omitted). The *Magaw* Court went on to note that the individual plaintiffs' claim that the Crime Control Act had a chilling effect on their ability to purchase the prohibited weapons did not establish standing because

> criminal law, by its very existence, may have some chilling effect on personal behavior. That is the reason for its passage.' *Doe v. Duling,* 782 F.2d 1202, 1206 (4th Cir.1986).... Except for cases involving core First Amendment rights, the 'existence of a 'chilling effect' ... has never been considered a sufficient basis, in and of itself, for prohibiting' [government action]. *Younger v. Harris,* 401 U.S. 37, 51, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

*Id.* at 294. Finally, the Sixth Circuit commented that

> [p]laintiffs' allegations of fear of prosecution, which thwarts their desire to possess or transfer prohibited products, affects not only the named plaintiffs, but also anyone desiring to possess the products proscribed by the Crime Control Act. The Supreme Court has refrained from adjudicating 'generalized grievances,' pervasively shared. *Valley Forge Christian College v. Americans United for Separation of Church and*

*State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The individualized plaintiffs' alleged harm amounts to no more than a 'generalized grievance' shared in substantially 'equal measure by ... a large class of citizens,' and thus does not warrant the exercise of jurisdiction. *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

*Id.*

Here, the plaintiffs contend that they "are in a situation similar to those in" *Peoples Rights Organization, Inc. v. Columbus,* 152 F.3d 522 (6th Cir.1998). *See* Plaintiffs' Memorandum in Opposition to Motion to Dismiss of Defendant Attorney General of the United States ("Pls.' Opp'n to Att'y Gen.'s Mot.") at 22. The Court cannot agree with this position. In *Peoples Rights Organization,* the plaintiffs, an organization and two of its members, brought a preenforcement challenge to a Columbus, Ohio city ordinance that prohibited the sale or possession of all assault weapons.[8] 152 F.3d at 527–28. The Sixth Circuit there began its analysis by examining its recent decision in *Magaw,* 132 F.3d 272, and concluded that its finding that the plaintiff had standing was consistent with the conclusions reached in *Magaw.* As explained above, in *Magaw,* three groups of plaintiffs challenged the Crime Control Act. The *Peoples Rights Organization* Court observed that the *Magaw* Court found that the firearms manufacturers and dealers had standing because of "substantial economic hardship," but that the two other groups, the individual plaintiffs and the associations, lacked standing because they suffered no injury-in-fact, as they simply alleged "that they 'desire[d]' and

8. Columbus City Code Section 2323.11(G) set forth five definitions of what constituted an "assault weapon." *Peoples Rights Org.,* 152 F.3d at 525–26 n. 1 (quoting Columbus City Code Section 2323.11(G)).

'wish[ed]' to engage in certain possibly prohibited activities, but are 'restrained' and 'inhibited' from doing so." *Peoples Rights Org.*, 152 F.3d at 529 (quoting *Magaw*, 132 F.3d at 293). On the other hand, in *Peoples Rights Organization*, the individual plaintiffs, *id.* at 528, and a "large number [of the organization's] members who reside[d] in Columbus ... possess[ed], display[ed], s[old], l[oaned], or acquire[d] semiautomatic rifles, handguns, shotguns, and parts." *Id.* at 526. The complaint alleged that the individual plaintiffs, *id.* at 528, and the organization's "members [were] unable to determine whether such firearms and parts are 'assault weapons' under the Columbus ordinance[,]" *id.* at 526, and accordingly they had failed to register their firearms as authorized by the ordinance's grandfather clause. *Id.* at 528. The Sixth Circuit found that the plaintiffs had standing to pursue their vagueness challenge to the Columbus City ordinance, which was "not subject to any type of clarifying interpretation by a local administrative agency[,]" *id.* at 530, because they were able to show "the significant possibility of future harm" as they were unsure of whether the weapons they currently possessed were prohibited. *Id.* at 530–31. Thus, because the *Peoples Rights Organization* plaintiffs could not and had no means of determining whether their weapons were prohibited, they faced a choice of "either possess[ing] their firearms in Columbus and risk prosecution under the City's law, or, alternatively, they c[ould] store their weapons outside the City, depriving themselves of the use and possession of the weapons." *Id.* at 529.

Such is not the case here. Not only are the District of Columbia statutes not being challenged on vagueness grounds, which if was the case would present the same need for judicial interpretation as in *Peoples Rights Organization*, but the immediacy and reality of future harm found to exist in *Peoples Rights Organization* is absent here, as was also the situation in *Magaw*. The *Peoples Rights Organization* Court found that the plaintiffs there had standing because they currently possessed firearms that were located in the city and possibly covered by the Columbus City ordinance, which is markedly different from the circumstances in *Magaw* and in this case, where the individual plaintiffs simply wish or desire to possess prohibited firearms within this jurisdiction. Thus, the plaintiffs in *Peoples Rights Organization* did not have the same type of "generalized grievances" shared not only by the "named plaintiffs" in *Magaw*, "but also anyone desiring to possess the products proscribed by the Crime Control Act." 132 F.3d at 294. And, as the *Magaw* Court noted, "[t]he Supreme Court has refrained from adjudicating 'generalized grievances,' pervasively shared." *Id.* (citing *Valley Forge*, 454 U.S. at 474–75, 102 S.Ct. 752).

**(A)** *The Plaintiffs' Challenges to the District of Columbia Statutory Regulation of the Possession of Firearms*

In this case, the plaintiffs have suffered no injury as a result of the District of Columbia's proscriptive gun control statutes. First, they are unable to point to any "credible threat of imminent prosecution ...." *Navegar*, 103 F.3d at 998. While this Court noted during the oral argument on the defendants' motions to dismiss that the government actively enforces the prohibition against the possession of pistols in the District of Columbia, case law is clear and unequivocal that for a plaintiff to have standing to pursue a preenforcement challenge outside of the First Amendment context, the threat of prosecution must be *imminent*. See *Magaw*, 132 F.3d at 279; *Navegar*, 103 F.3d

at 998; *San Diego County Gun Rights*, 98 F.3d at 1126; *Duling*, 782 F.2d at 1206 (noting that to establish standing, "[a] litigant must show more than the fact that state officials stand ready to perform their general duty to enforce [the] laws[.]") (citing *Poe v. Ullman*, 367 U.S. 497, 501, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961); *Watson v. Buck*, 313 U.S. 387, 399, 61 S.Ct. 962, 85 L.Ed. 1416 (1941)). A generalized grievance, which is presumably shared with many other citizens of the District of Columbia, without an imminent threat of prosecution or another type of injury-in-fact (*i.e.*, economic harm), is not sufficient to confer standing to the plaintiffs. The plaintiffs here stand in the same footing as the individual plaintiffs in *Magaw* and each of the plaintiffs in the *San Diego County Gun Rights* case, as they each simply state that they desire or wish to obtain pistols that they would possess in the District of Columbia. *See* Compl. ¶¶ 22–26. These assertions are clearly insufficient to establish injury-in-fact under Article III.

 Second, the plaintiffs' claims are not ripe for review because, as indicated above, only one of the plaintiffs has ever even applied for a registration certificate.[9] Although the plaintiffs suggest that pursuing registrations would be futile,[10] *see* Pls.' Opp'n to Att'y Gen.'s Mot. at 27–31, the plaintiffs cannot avoid pursuing the existing regulatory process. *Cf. Poulos v. New Hampshire*, 345 U.S. 395, 409 & n. 13, 73

S.Ct. 760, 97 L.Ed. 1105 (1953) (noting that an individual cannot use futility as a defense to a criminal prosecution when he has failed to apply for a license and that the proper course of action was to "seek[ ] a review in the civil courts of the licensing authority's refusal to issue him a license."). Here, as stated above, the District of Columbia Code provides a formal review process if an applicant is denied a registration certificate for a firearm. *See* D.C.Code § 7–2502.10. And, particularly important in this case, section 7–2507.09 of the District of Columbia Code provides that "[t]he provisions of the District of Columbia Administrative Procedure Act ("DCAPA") (§ 2–501 et seq.) shall apply to each proceeding, decision, or other administrative action specified in this unit . . . ." Thus, the plaintiffs are able to challenge a denial of their applications for registration certificates under the DCAPA and raise constitutional challenges to the District of Columbia's enactment and enforcement of the statutes at issue in this lawsuit pursuant to this statute. *See, e.g., McIntosh v. Washington*, 395 A.2d 744 (D.C.1978) (plaintiffs challenged the Firearms Control Regulations Act under both the DCAPA and the United States Constitution). Moreover, applying the criteria for assessing ripeness as set forth in *Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. 1507, further demonstrates that this case is not ripe for review. The plaintiffs are unable to establish any hard-

---

**9.** As the Court stated above, plaintiff Jordan's two applications were denied over twenty-five years ago. Thus, aside from the obvious statute of limitations concerns that arise from these stale denials, there is no prohibition against Jordan filing another application to register a pistol and, if it is again denied, pursuing a challenge through the District of Columbia's formal review process discussed below and outlined in D.C.Code §§ 7–2507.09–10 (2001).

**10.** While the Court needs not determine whether the pursuit of registrations by the plaintiffs would in fact be futile, the Court notes that aside from the previously mentioned exceptions to the registration requirement, *see* D.C.Code § 7–2502.01, Title 24 of the District of Columbia Municipal Regulations § 2303.9(c) permits the Chief of Police to issue a registration certificate to individuals who "[h]ave reason to fear injury to his or her person or property or any other proper reason." D.C. Mun. Regs. tit. 24, § 2303.9(c) (2001).

ship that they would sustain by utilizing the prescribed administrative process and awaiting an actual case or controversy should their applications be denied. Furthermore, the District of Columbia Circuit recognizes that under certain circumstances there exists prudential reasons to dismiss a case on justiciability grounds. In *Martin Tractor Co. v. FEC*, 627 F.2d 375 (D.C.Cir.1980), the Circuit Court noted that "[r]ipeness enters the Article III 'case or controversy' picture in the determination whether the requisite injury is in sharp enough focus and the adverseness of the parties concrete enough to permit a court to decide a real controversy and not a set of hypothetical possibilities." *Id.* at 379. The *Martin Tractor Co.* Court stated that

> [b]ecause of the great gravity and delicacy of (the courts') function in passing upon the validity of an act of Congress, the need is manifest for a full-bodied record in such adjudication. *United States v. International Union United*

*Auto., Aircraft and Agr. Implement Workers of America (UAW–CIO)*, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957) ... emphasized the importance of a detailed factual record upon which a court might limit, frame and perhaps avoid a constitutional decision.

*Id.* at 380 (internal citations and quotation marks omitted). Here too, this Court must be cautious in assessing the validity of the District of Columbia's statutes being challenged, as they are not only the product of the District of Columbia Council, but also congressional approval. A more fully developed factual record in which the plaintiffs have actually been harmed by an adverse ruling or a credible threat of imminent prosecution is therefore necessary to pursue an "as applied" challenge.[11] Accordingly, the plaintiffs do not have standing to challenge sections 7–2502.02 and 22–4504(a) of the District of Columbia Code, nor are such claims ripe for review at this time.[12]

11. While the plaintiffs' counsel would not concede at oral argument that the challenged statutes are constitutional on their face, this Court cannot imagine that the statutes would not survive a facial challenge. *See United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that [an Act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid ...."). Surely, for example, the District of Columbia can prohibit convicted violent offenders from possessing handguns. *See Lewis v. United States*, 445 U.S. 55, 65 n. 8, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980) (Such legislative proscriptions "are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties.").

12. Because this Court finds that the plaintiffs lack standing to challenge sections 7–2502.02 and 22–4504(a) of the District of Columbia

Code, it will dismiss the challenges to these statutes being advanced by each of the plaintiffs. In addition, the Court notes that plaintiffs Seegars, Jordan, Brown, and Hemphill do not have standing to challenge D.C.Code § 7–2507.02. This is not only because of all the reasons expressed by the Court with respect to their other challenges, but also because there are simply no allegations in their complaint about how they are harmed by a statute that regulates the manner in which firearms must be maintained when they do not already possess any firearms in the District of Columbia that are subject to the requirements of D.C.Code § 7–2507.02. Accordingly, the only remaining challenges that this Court needs to address are those to D.C.Code § 7–2507.02 raised by plaintiff Hailes, which are contained in Count One (Second Amendment), Count Two (D.C.Code § 1–303.43), and Count Three (42 U.S.C. § 1981(a)). However, the Court needs not spend a substantial amount of time on Counts Two and Three because as to these claims the plaintiff has failed to state a claim upon which relief can be granted, as it is "beyond doubt that the

### (B) *Plaintiff Hailes' Challenges to the District of Columbia Statutory Regulation of the Maintenance of Firearms*

As stated above, aside from challenging the District of Columbia statute that prevents the plaintiffs from lawfully possessing pistols in the District of Columbia, plaintiff Hailes has also lodged challenges to section 7–2507.02 of the District of Columbia Code, which provides that "each registrant shall keep any firearm in his possession unloaded and disassembled or bound by a trigger lock or similar device unless such firearm is kept at his place of business, or while being used for lawful recreational purposes within the District of Columbia." D.C.Code § 7–2507.02. The complaint in this case asserts that plaintiff Gardine Hailes "currently possesses in her home a registered shotgun which she keeps bound by a trigger lock. But for D.C.Code § 7–2507.02, she would remove the trigger lock when she deems it necessary to defend herself in her home." Compl. ¶ 23.

The Court finds that plaintiff Hailes' challenge to section 7–2507.02 is legally distinct from the plaintiffs' challenges to the District of Columbia statute that regulates the possession of pistols. In concluding that the plaintiffs' challenges to the statutory regulation of the possession of pistols were non-justiciable, the Court reasoned that the plaintiffs lacked standing because they were unable to show a "genuine threat of imminent prosecution," as they simply stated that they desire and wish to possess pistols in the District of Columbia. Moreover, their claims are not ripe for review because they have never even applied for firearm registrations or utilized the District of Columbia's formal review process that is available to unsuccessful applicants. *See* D.C.Code § 7–2502.10. However, with respect to plaintiff Hailes' challenge to section 7–2507.02's regulation concerning how registered firearms must be maintained, Hailes already possesses a registered shotgun in the District of Columbia, Compl. ¶ 23, and is therefore obligated to have it secured by a trigger lock if it is not unloaded and disas-

plaintiff can prove no set of facts in support of h[er] claim[s] which would entitle h[er] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). First, it is clear that plaintiff Hailes' "claim under section 1981 must ... fail in the absence of racially motivated discrimination. This section, taken from the Civil Rights Act of 1866, is directed solely at racial discrimination." *Lewis v. Green*, 629 F.Supp. 546, 552 (D.D.C. 1986) (citing *Nat'l Ass'n of Gov't Employees v. Rumsfeld*, 413 F.Supp. 1224 (D.D.C.), *aff'd without opinion*, 556 F.2d 76 (D.C.Cir.1977); *Woods v. State*, 469 F.Supp. 1127 (S.D.N.Y.), *aff'd without opinion*, 614 F.2d 1293 (2d Cir. 1979)). Thus, the Court will dismiss Count Three because plaintiff Hailes has failed to assert that she was purposefully discriminated against based on her race. Second, plaintiff Hailes' claim that D.C.Code § 7–2507.02 violates D.C.Code § 1–303.43 because it is not a "usual and reasonable police regulation[ ] ... necessary for the regulation of firearms," D.C.Code § 1–303.43, is also without merit.

In *McIntosh v. Washington*, 395 A.2d 744 (D.C.1978), the District of Columbia Court of Appeals dealt with a similar challenge to the Firearms Control Regulations Act (the "Act"), D.C.Code §§ 7–2501.01, *et seq.* (2001). In that case, the appellants asserted that the Act did not constitute a legitimate exercise of authority by the District of Columbia Council pursuant to D.C.Code § 1–303.43. *McIntosh*, 395 A.2d at 749–50. In disagreeing with the appellants' position, the Court of Appeals found that the "validity of the Firearms Act can be sustained under [what at that time was] the Council's newly conferred power set forth in § [1–204.04] of the Home Rule Act ...." *Id.* at 750. This Court agrees and therefore must dismiss Count Two. Thus, the Court needs not address whether Ms. Hailes would have standing to assert challenges to D.C.Code § 7–2507.02 pursuant to 42 U.S.C. § 1981(a) and D.C.Code § 1–303.43, as she clearly has failed to state claims upon which relief can be granted based on these two statutes.

sembled. Plaintiff Hailes states in her complaint that "[b]ut for D.C.Code § 7–2507.02, she would remove the trigger lock when she deems it necessary to defend herself in her home[,]" *id.*, and that "[a]s a proximate cause of D.C.Code § 7–2507.02 and the enforcement thereof ... [she] is subjected to irreparable harm in that she is unable, no matter what the circumstances, to keep her registered shotgun in a manner ready for use to protect herself in her own home from attack by violent intruders." Compl. ¶ 30. And, plaintiff Hailes contends that the requirements of section 7–2507.02 infringe on her right "to keep and bear arms as guaranteed by the Second Amendment." *Id.* ¶ 36. Thus, Ms. Hailes must forego maintaining her shotgun in the manner she desires because of D.C.Code § 7–2507.02. Moreover, as the Attorney General acknowledges, "[u]nlike ... the other claims she has brought in this case ...[,] Ms. Hailes would not appear to have an administrative avenue that she could pursue against the District to obtain eventual court review of her claims with respect to the lawfulness of § 7–2507.02." Memorandum of Defendant Attorney General of the United States in Response to Order of October 16, 2003 at 8 n. 5.

In *Navegar*, the District of Columbia Circuit stated that

[t]o require litigants seeking resolution of a dispute that is appropriate for adjudication in federal court to violate the law and subject themselves to criminal prosecution before their challenges may be heard would create incentives that are perverse from the perspective of law enforcement, unfair to the litigants, and totally unrelated to the constitutional or prudential concerns underlying the doctrine of justiciability.

103 F.3d at 1000–01. This is Hailes' predicament. Absent the availability of an administrative mechanism to seek review of the trigger lock requirement, Ms. Hailes would be left in a precarious dilemma without judicial recourse, *i.e.*, either maintain the trigger lock on her shotgun and "forego possibl[e] lawful activity because of her well-founded fear of prosecution," *id.* at 998, or remove it and "willfully violate [section 7–2507.02 of the District of Columbia Code], thereby subjecting herself to criminal prosecution and punishment." *Id.* Accordingly, the Court finds that plaintiff Hailes' challenge to D.C.Code § 7–2507.02 is legally distinct from the plaintiffs' challenges to the District of Columbia statute that regulates the possession of pistols and therefore the Court must consider whether the provision offends the Second Amendment. The Court will now proceed with that analysis.[13]

---

**13.** In concluding that plaintiff Hailes' Second Amendment challenge to D.C.Code § 7–2507.02 is legally distinct from the plaintiffs' challenges to the District of Columbia statute that regulates the possession of pistols, the Court finds that it must address the scope of the Second Amendment and whether it provides an individual right to possess firearms. While some courts have addressed Second Amendment claims on the merits, *see Gillespie v. City of Indianapolis*, 185 F.3d 693, 710 (7th Cir.1999), *cert. denied*, 528 U.S. 1116, 120 S.Ct. 934, 145 L.Ed.2d 813 (2000), and others have resolved such challenges under the standing doctrine, *see Silveira v. Lockyer*, 312 F.3d 1052, 1066–67 n. 17 (9th Cir.2002),

*cert. denied*, —— U.S. ——, 124 S.Ct. 803, 157 L.Ed.2d 693, 2003 WL 21692140 (U.S. Dec. 1, 2003), this Court agrees with the *Silveira* Court that "as a practical matter, the choice of jurisprudential approach makes little or no difference." *Id.* This is because pursuant to either approach the Court must undertake a thorough analysis of the scope and purpose of the Second Amendment in order to determine whether a plaintiff is able to assert a constitutional challenge under this Amendment. In any event, because this Court concludes below that plaintiff Hailes is unable to assert a challenge to D.C.Code § 7–2507.02 pursuant to the Second Amendment because it does not

### (2) *What is the Scope of the Second Amendment?*

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. One of the leading constitutional debates today centers around the scope of the Second Amendment and whether its purpose is to protect the sanctity of state militias or to provide a fundamental right to individuals, irrespective of their relationship to state militias, to possess firearms. At a time in our country's history when domestic security is a paramount concern of our nation's citizenry, several events have brought the Second Amendment debate to the forefront, including: the lobbying efforts of the National Rifle Association ("NRA"),[14] the Department of Justice's ("DOJ") reversal of its long-standing position on the Second Amendment, which is now that the Second Amendment provides a fundamental individual right to possess weapons, *see Silveira v. Lockyer,* 312 F.3d 1052, 1064–65 (9th Cir.2002), *cert. denied,* —— U.S. ——, 124 S.Ct. 803, 157 L.Ed.2d 693, 2003 WL 21692140 (U.S. Dec. 1, 2003),[15] and the Fifth Circuit's recent decision in *United States v. Emerson,* 270 F.3d 203, where, for the first time ever, a United States Circuit Court of Appeals held that the Second Amendment guarantees a funda-mental individual right to possess firearms. Against this backdrop, the plaintiffs in this case assert that as residents of the District of Columbia they have a fundamental individual right to possess firearms pursuant to the Second Amendment.

The debate regarding the scope of the Second Amendment encompasses three separate schools of thought. The first is what has been referred to as the "traditional individual rights" model, which posits "that the Second Amendment guarantees to individual private citizens a fundamental right to possess and use firearms for any purpose at all, subject only to limited government regulation." *Silveira,* 312 F.3d at 1060; *see Emerson,* 270 F.3d at 220 (stating that this "model is simply that the Second Amendment recognizes the right of individuals to keep and bear arms"). The second model is "a variant of the first," and has been referred to by the Ninth Circuit as the "limited individual rights" model, which opines that "individuals maintain a constitutional right to possess firearms insofar as such possession bears a reasonable relationship to militia service." *Silveira,* 312 F.3d at 1060. The Fifth Circuit referred to this second model as the "sophisticated collective rights" model, and explained that this model recognizes that an

---

provide an individual right to possess firearms, for procedural purposes the Court finds that Hailes' challenge to D.C.Code § 7–2507.02 must also be dismissed for lack of standing.

**14.** Apparently the plaintiffs in this case have filed their lawsuit with the support of the NRA. *See* Motions and Memorandum of the Violence Policy Center for Leave to File a Brief as Amicus Curiae in Support of Defendants' Motions to Dismiss at 1 n. 1.

**15.** In a brief filed with the Supreme Court, the Solicitor General advised the Court that "[t]he current position of the United States ... is that the Second Amendment more broadly protects the rights of individuals, including persons who are not members of any militia or engaged in active military service or training, to possess and bear their own firearms, subject to reasonable restrictions ...." *Silveira,* 312 F.3d at 1065. Consistent with this position, the DOJ has informed this Court that this is still the position of the DOJ. *See* Att'y Gen.'s Mot. at 13 n. 11.

'individual' right to *bear* arms can only be exercised by members of a functioning, organized state militia who bear the arms while and as a part of actively participating in the organized militia's activities. The 'individual' right to *keep* arms only applies to members of such a militia, and then only if the federal and state governments fail to provide the firearms necessary for such militia service. At present, virtually the only such organized and actively functioning militia is the National Guard, and this has been the case for many years. Currently, the federal government provides the necessary implements of warfare, including firearms, to the National Guard, and this likewise has long been the case. Thus, under this model, the Second Amendment poses no obstacle to the wholesale disarmament of the American people.

*Emerson,* 270 F.3d at 219. The third model, which is characterized as the "states' rights" or "collective rights" model,

asserts that the Second Amendment right to 'bear arms' guarantees the right of the people to maintain effective state militias, but does not provide any type of individual right to own or possess weapons. Under this theory of the amendment, the federal and state governments have the full authority to enact prohibitions and restrictions on the use and possession of firearms, subject only to generally applicable constitutional constraints, such as due process, equal protection, and the like.

*Silveira,* 312 F.3d at 1060; *see Emerson,* 270 F.3d at 218.

### (A) *Early Judicial History of the Second Amendment*

A review of early Second Amendment jurisprudence is an important starting point in the Court's analysis of whether District of Columbia residents have a fundamental right to possess firearms. The Supreme Court's only substantive discussion of the Second Amendment is found in the 1939 seminal case of *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). In *Miller,* the defendants were indicted for "unlawfully, knowingly, wilfully, and feloniously transport[ing] in interstate commerce . . . a double barrel 12–gauge Stevens shotgun having a barrel less than 18 inches in length . . . ." *Id.* at 175, 59 S.Ct. 816. The defendants asserted, in part, that the National Firearms Act violated the Second Amendment. The district court agreed and dismissed the indictment. *Id.* at 176–77, 59 S.Ct. 816. On direct appeal from the district court's ruling, the Supreme Court authored what is perhaps the most widely quoted language on Second Amendment jurisprudence, albeit in what has been characterized as "a somewhat cryptic discussion." *Silveira,* 312 F.3d at 1061. The *Miller* Court stated:

In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense. *Aymette v. State,* 21 Tenn. (2 Humph.) 154 (1840).

The Constitution as originally adopted granted to the Congress power—'To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; To provide for organizing, arming, and disciplining, the Militia, and for governing

such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.' With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view.

*Id.* at 178, 59 S.Ct. 816 (quoting U.S. Const. art. I, § 8). The *Miller* Court then went on to explain that

[t]he Militia which the States were expected to maintain and train is set in contrast with Troops which they were forbidden to keep without the consent of Congress. The sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia—civilians primarily, soldiers on occasion.

The signification attributed to the term Militia appears from the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators. These show plainly enough that the Militia comprised all males physically capable of acting in concert for the common defense. 'A body of citizens enrolled for military discipline.' And further, that ordinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.

*Id.* at 178–79, 59 S.Ct. 816. In a rather interesting review by the *Miller* Court of several state laws (Massachusetts, New York and Virginia) that were in existence just prior to the enactment of the Second Amendment, it appears that these states affirmatively required that its citizens be armed and members of those states' militias. *Id.* at 179–82, 59 S.Ct. 816. As the final reason for reversing the lower court's acceptance of the defendants' Second Amendment challenge to the statute under which they had been indicted, the Supreme Court noted that "[m]ost if not all of the States have adopted provisions touching the right to keep and bear arms." *Id.* at 182, 59 S.Ct. 816. The Court then observed that "none of [the states] seem to afford any material support for the challenged ruling of the court below." *Id.* "[S]ome of the more important opinions ..." on the subject that supported the Court's conclusion were then cited in *Miller*, including: the United States Supreme Court's opinions in *Presser v. Illinois*, 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886) and *Robertson v. Baldwin*, 165 U.S. 275, 17 S.Ct. 326, 41 L.Ed. 715 (1897), the Supreme Court of Kansas' opinion in *Salina v. Blaksley*, 72 Kan. 230, 83 P. 619 (1905), the Supreme Court of Tennessee's opinion in *Aymette v. State*, 21 Tenn. (2 Hum.) 154, 1840 WL 1554 (1840), the Supreme Court of Michigan's opinion in *People v. Brown*, 253 Mich. 537, 235 N.W. 245 (1931), the Supreme Court of Texas' opinion in *State v. Duke*, 42 Tex. 455, 1875 WL 7460 (1875), and the Supreme Court of Appeals of West Virginia's opinion in *State v. Workman*, 35 W.Va. 367, 14 S.E. 9 (1891).

While those courts that have analyzed the Supreme Court's decision in *Miller* have chosen not to focus much attention on the state court cases cited by the Court, presumably because most of them are state court cases construing state constitutional provisions, this Court finds it important to discuss their holdings because not only did the Supreme Court find them to be noteworthy enough to cite, but also because they provide a historical perspec-

tive on the origin and scope of the Second Amendment.[16]

### (i) *The Other Supreme Court Cases Referenced in Miller*

Before discussing the state court opinions cited in *Miller*, the Court will first examine the two earlier United States Supreme Court cases cited by the *Miller* Court: *Presser v. Illinois* and *Robertson v. Baldwin*. In *Presser*, the defendant was convicted of violating an Illinois statute that prohibited "any body of men [ ], other than the regular organized volunteer militia of [the] state, and the troops of the United States, to associate themselves together as a military company or organization, or to drill or parade with arms in any city or town of [the] state, without [a] license [from] the governor ...." 116 U.S. at 253, 6 S.Ct. 580 (citation omitted). The defendant challenged the Illinois statute on several different grounds, including a Second Amendment challenge. The Supreme Court, however, responded that

> the amendment is a limitation only upon the power of congress and the national government, and not upon that of the state. It was so held by this court in the case of *U[nited] S[tates] v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588 (1875), in which the chief justice, in delivering the judgment of the court, said that the right of the people to keep and bear arms 'is not a right granted by the constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment

declares that it shall not be infringed, but this, as has been seen, means no more than that it shall not be infringed by congress. This is one of the amendments that has no other effect than to restrict the powers of the national government ....'

> It is undoubtedly true that all citizens capable of bearing arms constitute the reserved military force or reserve militia of the United States as well as of the states, and, in view of this prerogative of the general government, as well as of its general powers, the states cannot, even laying the constitutional provision in question out of view, prohibit the people from keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable the people from performing their duty to the general government.

*Id.* at 265, 6 S.Ct. 580. Because the Supreme Court found that the Illinois statute did not have the effect of depriving the United States of a "resource [necessary] for maintaining the public security ... [,]" *id.* at 265, 6 S.Ct. 580, the *Presser* Court found no Second Amendment violation. *Id.* at 265–66, 116 U.S. 252.

In *Robertson*, the Supreme Court stated in dicta that "[t]he law is perfectly well settled that the first 10 amendments to the constitution, commonly know as the 'Bill of Rights,' were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immuni-

**16.** The Court notes that the Supreme Court's only reference to the scope of the Second Amendment following *Miller* was in *Lewis v. United States*, 445 U.S. 55, 65 n. 8, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980). In *Lewis*, the Supreme Court dismissed a Second Amendment challenge to a conviction under a statute that prohibited a convicted felon from possessing a firearm, stating in a footnote that "[t]hese legislative restrictions on the use of firearms are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties." *Id.* (citing *Miller*, 307 U.S. 174, 59 S.Ct. 816). The *Lewis* Court characterized the holding in *Miller* as follows: "the Second Amendment guarantees no right to keep and bear a firearm that does not have 'some reasonable relationship to the preservation or efficiency of a well regulated militia.'" *Id.*

ties which we had inherited from our English ancestors ...." 165 U.S. at 281, 17 S.Ct. 326. The *Robertson* Court further commented that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons[.]" *Id.* at 281–82, 17 S.Ct. 326.

*Presser* and *Robertson* provide guidance on the scope of the Second Amendment in several important respects. First, the Second Amendment is only a limitation on the national government and does not prohibit the states from restricting their own residents' access to firearms, so long as the states do not impair the national government's ability to provide for the national security. *See Presser*, 116 U.S. at 265, 6 S.Ct. 580. Second, that it is imperative to look at the historical origin of the Second Amendment to determine its scope. *See Robertson*, 165 U.S. at 281, 17 S.Ct. 326.

### (ii) *The State Cases Referenced in Miller*

With the foregoing two principles in mind, the Court will now turn briefly to an examination of the several state court decisions cited by the *Miller* Court at the conclusion of its opinion. As the *Miller* Court noted, "[d]ifferences in the language employed in [the state constitutional provisions construed by those courts] have naturally led to somewhat variant conclusions concerning the scope of the right guaranteed." 307 U.S. at 182, 59 S.Ct. 816. However, what is important to this Court's analysis is not the varying extent of the right to possess firearms afforded by the different states, but what can be gleaned from these opinions about the scope of the right to "keep and bear arms" afforded by the United States Constitution in the Second Amendment as viewed by the Supreme Court in *Miller*.

In the Kansas Supreme Court's *Blaksley* case, the defendant was convicted of "carrying a revolving pistol within the city while under the influence of intoxicating liquor." 83 P. at 620. The defendant challenged the constitutionality of the local statute that permitted the regulation of firearms under section 4 of Kansas' Bill of Rights which stated: "The people have the right to bear arms for their defense and security; but standing armies, in time of peace, are dangerous to liberty, and shall not be tolerated, and the military shall be in strict subordination to the civil power." *Id.* The Kansas Supreme Court began its analysis by noting that the state constitutional right "refers to the people as a collective body. It was the safety and security of society that was being considered when this provision was put into our Constitution." *Id.* The *Blaksley* Court commented that

> [i]n some states where it has been held, under similar provisions, that the citizen has the right preserved by the Constitution to carry such arms as are ordinarily used in civilized warfare, it is placed on the ground that it was intended that the people would thereby become accustomed to handling and using such arms, so that in case of an emergency they would be more or less prepared for the duties of a soldier. The weakness of this argument lies in the fact that in nearly every state in the Union there are provisions for organizing and drilling state militia in sufficient numbers to meet any such emergency.

*Id.* And of particular significance to this case, the court stated

> [t]hat the provision in question applies only to the right to bear arms as a member of the state militia, or some other military organization provided for by law, is also apparent from the second amendment to the federal Constitution

.... Here, also, the right of the people to keep and bear arms for their security is preserved, and the manner of bearing them for such purpose is clearly indicated to be as a member of a well-regulated militia, or some other military organization provided for by law.

*Id.* Thus, the *Blaksley* Court found that because the defendant was not a member of an organized militia, or any other lawful military organization, he was not protected against prosecution by section 4 of the Kansas Bill of Rights. *Id.* at 621.

The Supreme Court of Tennessee provided an instructive discussion on the phrase "bear arms" in *Aymette*, which the court concluded implies a military use of weapons. 21 Tenn. 154, 1840 WL 1554, at *5. In *Aymette*, the defendant was convicted of carrying a concealed bowie-knife under his clothes and challenged his conviction under the first article of the Tennessee state constitution, which in section twenty-six contained a declaration of rights which stated "that the free white men of [Tennessee] have a right to keep and bear arms for their common defen[s]e." *Id.* at *1. The *Aymette* Court began its discussion by examining the history underlying the meaning of the clause of the Tennessee state constitution that was under consideration. *Id.* at *2. The court noted that English law originally permitted only individuals of "a certain condition in life," *i.e.,* wealthy individuals, to possess arms "while a large proportion of the people were entirely disarmed." *Id.* However, King James II, "by his own arbitrary power, and contrary to law, disarmed the Protestant population, and quartered his Catholic soldiers among the people. This, together with other abuses, produced the revolution ... [and] William and Mary succeeded him ...." *Id.* With new leadership assuming the throne, "Parliament ... declared the existence of certain rights which they insisted upon as

their undoubted privileges." *Id.* In the declaration of rights, Protestants were given the right to possess arms, but this privilege once again only extended to the wealthy. *Id.* The *Aymette* Court commented that

[t]he evil that was produced by disarming the people in the time of James II was that the king, by means of a standing army quartered among the people, was able to overawe them, and compel them to submit to the most arbitrary, cruel, and illegal measures. Whereas, if the people had retained their arms, they would have been able, by a just and proper resistance to those oppressive measures, either to have caused the king to respect their rights, or surrender (as he was eventually compelled to do) the government into other hands. No private defen[s]e was . contemplated, or would have availed anything.... When, therefore, Parliament says that 'subjects which are Protestants may have arms for their defen[s]e, suitable to their condition, as allowed by law,' it does not mean for private defen[s]e, but, being armed, they may as a body rise up to defend their just rights, and compel their rulers to respect the laws.

*Id.* Therefore, the *Aymette* Court concluded:

As the object for which the right to keep and bear arms is secured is of general and public nature, to be exercised by the people in a body, for their common defen[s]e, so the arms the right to keep which are secured are such as are usually employed in civilized warfare, and that constitute the ordinary military equipment. If the citizens have these arms in their hands, they are prepared in the best possible manner to repel any encroachments upon their rights by those in authority. They need not, for such a purpose, the use of those weapons which

are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin. These weapons would be useless in war. They could not be employed advantageously in the common defen[s]e of the citizens. The right to keep and bear them is not therefore, secured by the constitution.

*Id.* at *3.

In *Brown*, the defendant was convicted of carrying a blackjack, which was deemed to be a dangerous weapon. 235 N.W. at 245. The defendant challenged his conviction under section 5 of article 2 of Michigan's Constitution, which provides that "Every person has a right to bear arms for the defense of himself and the state." *Id.* at 246. The *Brown* Court commented that

[i]t is generally recognized that the constitutional declaration, in both Federal and State Constitutions, of the right to bear arms, had its origin in the fear of the American colonists of a standing army and its use to oppress the people, and in their attachment to a militia composed of all able-bodied men. Probably the necessity of self-protection in a frontier society also was a factor.

*Id.* Acknowledging that there was some disagreement among the states regarding the scope of the Second Amendment's protections, the *Brown* Court stated that "[t]he authorities cannot be reconciled except in respect of the proposition that, regardless of the basis of the right to bear arms, the state, nevertheless, has the police power to reasonably regulate it." *Id.* (citations omitted). The *Brown* Court went on to comment:

When the bulwark of state defense was the militia, privately armed, there may have been good reason for the historical and military test of the right to bear arms. But in this state the militia, although legally existent and composed of all able-bodied male citizens of Michigan and those of foreign birth who have declared their intention to become citizens, is practically extinct and has been superceded by the National Guard and reserve organizations. If called to service, the arms are furnished by the state. In times of peace, the militia, as such, is unarmed and the historical test would render the constitutional provision lifeless.

*Id.* (internal citations omitted).

In *Duke*, the defendant challenged the constitutionality of a Texas statute that made it unlawful to carry a pistol. 42 Tex. 455, 1875 WL 7460, at *1. The *Duke* Court commented that the Second Amendment and the other amendments of the Bill of Rights "were intended to be limitations on the power of the government of the thirteen States, and not on the powers of the State governments." *Id.* at *2 (citing *Barron v. City of Baltimore*, 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833)). The court considered whether the Texas statute violated the 13th section of the Bill of Rights in the Texas Constitution, which stated that "[e]very person shall have the right to keep and bear arms in the lawful defense of himself or the State, under such regulations as the Legislature may prescribe." *Id.* Noting that there was "no recital of the necessity of a well-regulated militia, as there is in the corresponding clause in the Constitution of the United States[,]" the court found the statute valid because "the Act in question is nothing more than a legitimate and highly proper regulation of [the] use [of pistols]." *Id.* at *3.

Finally, in *Workman*, the defendant was convicted under state law of carrying a concealed weapon and the Supreme Court of Appeals of West Virginia was asked to consider whether the state statute violated the Second Amendment. 14 S.E. at 10–11. In discussing the origins of the Second

Amendment, the *Workman* Court commented:

> As early as the second year of Edward III., a statute was passed prohibiting all persons, whatever their condition, 'to go or ride armed by night or day.' And so also at common law the 'going around with unusual and dangerous weapons to the terror of the people' was a criminal offense. The keeping and bearing of arms, therefore, which at the date of the amendment was intended to be protected as a popular right, was not such as the common law condemned, but was such a keeping and bearing as the public liberty and its preservation commended as lawful, and worthy of protection. So, also, in regard to the kind of arms referred to in the amendment, it must be held to refer to the weapons of warfare to be used by the militia, such as swords, guns, rifles, and muskets,—arms to be used in defending the state and civil liberty,—and not to pistols . . . and such other weapons as are usually employed in brawls, street fights, duels, and affrays, and are only habitually carried by bullies, blackguards, desperados, to the terror of the community and the injury of the state.

*Id.* at 11 (internal citations omitted).

These state court opinions provide several significant insights about the scope of the Second Amendment. First, and of prime importance to this case, the Second Amendment is not a grant of an individual right to bear arms, but a right solely designed to protect the vitality of the state militias. This is perhaps best captured by the *Blaksley* Court's comments that "the right of the people to keep and bear arms for their security is preserved, and the manner of bearing them for such purpose is clearly indicated to be as a member of a well-regulated [state] militia . . . [,]" 83 P. at 620, and the *Aymette* Court's discussion

of the historical origin of the Second Amendment and that the right derived from the amendment "does not mean for private defen[s]e, but, being armed, [the people] may as a body rise up to defend their just rights, and compel their rulers to respect the laws." 21 Tenn. 154, 1840 WL 1554, at *2. And, as the *Brown* Court stated, this collective body that was established to protect "the people" from their fears of "a standing army and its use to oppress the people" was the state militia. 235 N.W. at 246. Second, this Court finds it very telling that the *Blaksley* Court directly addressed the assertion by some that the Second Amendment was an individual right designed and "intended [so] that the people would thereby become accustomed to handling and using such arms [as are ordinarily used in warfare]." 83 P. at 620. The court concluded that "[t]he weakness of this argument lies in the fact that in nearly ever state in the Union there are provisions for organizing and drilling state militia in sufficient numbers to meet any such emergency." *Id.* And such is the case in the District of Columbia. *See* D.C.Code § 49–401 (2001). While these cases do not conclusively resolve the debate over the scope of the Second Amendment, they are significant not only because the *Miller* Court found them noteworthy and none of them recognized an individual right to bear arms, but also because they provide important historical background concerning the origin of the Second Amendment.

**(B)** *Modern Second Amendment Jurisprudence*

For more than sixty years following the Supreme Court's decision in *Miller*, there was little judicial debate regarding the scope of the Second Amendment, as almost every circuit court interpreted *Miller* as rejecting the notion that the Second Amendment provided individuals a consti-

tutional right to possess firearms. *See Thomas v. Members of City Council,* 730 F.2d 41, 42 (1st Cir.1984) ("Established case law makes clear that the federal Constitution grants appellants no right to carry a concealed handgun."); *United States v. Rybar,* 103 F.3d 273, 286 (3d Cir.1996), *cert. denied,* 522 U.S. 807, 118 S.Ct. 46, 139 L.Ed.2d 13 (1997); *Love v. Pepersack,* 47 F.3d 120, 124 (4th Cir.), *cert. denied,* 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 27 (1995) ("The Second Amendment does not apply to the states. Moreover, even as against federal regulation, the amendment does not confer an absolute individual right to bear any type of firearm."); *United States v. Warin,* 530 F.2d 103, 106 (6th Cir.), *cert. denied,* 426 U.S. 948, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976); *Gillespie v. City of Indianapolis,* 185 F.3d 693, 710 (7th Cir.1999), *cert. denied,* 528 U.S. 1116, 120 S.Ct. 934, 145 L.Ed.2d 813 (2000) ("Whatever questions remain unanswered, *Miller* and its progeny do confirm that the Second Amendment establishes no right to possess a firearm apart from the role possession of the gun might play in maintaining a state militia."); *United States v. Hale,* 978 F.2d 1016, 1019–20 (8th Cir. 1992), *cert. denied,* 507 U.S. 997, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993); *Hickman v. Block,* 81 F.3d 98, 102 (9th Cir.1996) ("[I]t is clear that the Second Amendment guarantees a collective rather than an individual right. Because the Second Amendment guarantees the right of the states to maintain armed militia, the states alone stand in the position to show legal injury when this right is infringed."); *United States v. Oakes,* 564 F.2d 384, 387 (10th Cir.1977), *cert. denied,* 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 521 (1978) ("The purpose of the second amendment as stated by the Supreme Court in *United States v. Miller,* [ ] was to preserve the effectiveness and assure the continuation of the state militia. The Court stated that the amendment must be interpreted and applied with that purpose in view. To apply the amendment so as to guarantee appellant's right to keep an unregistered firearm which has not been shown to have any connection to the militia, merely because he is technically a member of the Kansas militia, would be unjustifiable in terms of logic or policy."); *United States v. Wright,* 117 F.3d 1265, 1271–74 (11th Cir.), *cert. denied,* 522 U.S. 1007, 118 S.Ct. 584, 139 L.Ed.2d 422 (1997) ("Because [the plaintiff] has presented no evidence to demonstrate any connection, let alone a 'reasonable relationship,' between his possession of the machineguns and pipe bombs and the preservation or efficiency of militia actively trained and maintained by the State of Georgia, his weapons possession is entitled to no constitutional protection.").[17] Then,

---

**17.** In *Silveira,* the Ninth Circuit stated "[i]t appears that only the Second and District of Columbia Circuits have not taken a position, considered or otherwise, on the nature of the right established by the Second Amendment." 312 F.3d at 1063 n. 11. However, this Court notes that in *United States v. Toner,* 728 F.2d 115 (2d Cir.1984), the Second Circuit commented that the defendant's concession that a federal statute that "makes it a felony for an illegal alien to receive, possess, or transport 'in commerce or affecting commerce . . . any firearm' . . . passes constitutional muster if it rests on a rational basis, [was] clearly correct since the right to possess a gun is clearly not a fundamental right . . . ." *Id.* at 128 (citing *Miller,* 307 U.S. 174, 59 S.Ct. 816 (cited for the proposition that "in the absence of evidence showing that firearm has 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' Second Amendment does not guarantee right to keep and bear such a weapon")). While the Second Circuit may not have taken a definitive position on the Second Amendment, it clearly concluded that the Second Amendment does not provide a fundamental individual right to possess a weapon.

The District of Columbia Circuit, however, up to this point has chosen not to address the scope of the Second Amendment. In *Frater-*

in 2001, a divided panel [18] of the Fifth Circuit altered the judicial landscape of Second Amendment jurisprudence in *United States v. Emerson*, stating that

> consistent with *Miller*, that [the Second Amendment] protects the right of individuals, including those not then actually a member of any militia or engaged in active military service or training, to privately possess and bear their own firearms ... that are suitable as personal, individual weapons and are not of the general kind or type excluded by *Miller*.

*Id.* at 260. The *Emerson* Court focused much of its discussion of *Miller* on the brief that the government had filed before the Supreme Court in *Miller*, finding that the government advanced two separate arguments on appeal. First, the government in *Miller* asserted that the "right secured by the Second Amendment is 'only one which exists where the arms are borne in the militia or some other military organiza-

tion provided for by law and intended for the protection of the state.'" *Id.* at 220, 59 S.Ct. 816 (citing Government's Brief at 15). In its second argument, the government asserted that "the terms 'arms' as used in constitutional provisions refers only to those weapons which are ordinarily used for military or public defense purposes and does not relate to those weapons which are commonly used by criminals." *Id.* After citing several state court cases and *Robertson*, the government's brief in *Miller* stated:

> That the foregoing cases conclusively establish that the Second Amendment has relation only to the right of the people to keep and bear arms for lawful purposes and does not conceivably relate to weapons of the type referred to in the National Firearms Act cannot be doubted. Sawed-off shotguns, sawed-off rifles and machine guns are clearly weapons which

*nal Order of Police v. United States*, 152 F.3d 998 (D.C.Cir.1998), the Circuit Court stated that "[d]espite the intriguing questions raised, we will not attempt to resolve the status of the Second Amendment right ...." *Id.* at 1002. Most recently, in *United States v. Maple*, 334 F.3d 15, 21 (D.C.Cir.), *vacated in part* by 348 F.3d 260, 261–62 (D.C.Cir.2003) (vacating only part II of the opinion dealing with the constitutionality of a warrantless search of the defendant's car and reversing defendant's conviction and remanding the case for a retrial), a defendant attempted to challenge the constitutionality of section 22–4504(a) of the District of Columbia Code, which states: "No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon capable of being so concealed." D.C.Code § 22–4504(a) (2001). The defendant in *Maple* asserted that although he failed to raise this challenge before the district court, it was "plain error" for the trial court not to consider the constitutionality of this statute in light of the Fifth Circuit's holding in *Emerson*. *Maple*, 334 F.3d at 21. The Circuit Court,

however, concluded that "[a]lthough there are cases in which it is appropriate to hear a constitutional claim not raised at trial, clearly this is not one of them. Convictions for unlicensed gun possession have been upheld for several years in the District of Columbia." *Id.* (internal citations omitted).

18. In a concurrence, Judge Parker stated that he chose

> not to join Section V, which concludes that the right to keep and bear arms under the Second Amendment is an individual right, because it is dicta and is therefore not binding on us or on any other court.... The fact that the 84 pages of dicta contained in Section V are interesting, scholarly, and well written does not change the fact that they are dicta and amount to at best an advisory treatise on this long-running debate.... No doubt the special interests and academics on both sides of this debate will take great interest in the fact that at long last some court has determined (albeit in dicta) that the Second Amendment bestows an individual right.

*Emerson*, 270 F.3d at 272–74 (Parker, J., concurring).

can have no legitimate use in the hands of private individuals.

*Id.* at 223, 59 S.Ct. 816. The *Emerson* Court concluded that the Supreme Court in *Miller* based its ruling on the government's second argument and not its first argument because nowhere in the opinion is there a discussion regarding whether the defendants had a connection to a militia. The *Emerson* Court reasoned that "[h]ad the lack of such membership or engagement been a ground of the decision in *Miller,* the Court's opinion would obviously have made mention of it. But it did not." *Id.* at 224, 59 S.Ct. 816. Thus, two judges of the Fifth Circuit have embraced what has been deemed by the Ninth Circuit to be "a weapons-based theory of the amendment that permits individuals to possess firearms for personal use, regardless of the relationship of the individual or the weapon to militia service, as long as those weapons have a 'legitimate use in the hands of private individuals.'" *Silveira,* 312 F.3d at 1063 n. 11 (citing *Emerson,* 270 F.3d at 223).

Following *Emerson*'s ground-breaking conclusion, the Ninth Circuit in *Silveira* found that the appellants in that case lacked standing to challenge the California Assault Weapons Control Act, Cal.Penal Code § 12275 *et seq.,* on Second Amendment grounds, concluding that

> when we give the text [of the Second Amendment] its most plausible reading and consider the amendment in light of the historical context and circumstances surrounding its enactment we are compelled to reaffirm the collective rights view we adopted in *Hickman:* The amendment protects the people's right to maintain an effective state militia, and does not establish an individual right to own or possess firearms for personal or other use.

*Id.* at 1066 (citing *Hickman v. Block,* 81 F.3d 98 (9th Cir.1996)). Thus, in reaffirming the position taken by all of the circuit courts that have considered the question and rejected the notion that the Second Amendment provides individuals with a constitutional right to possess firearms, with the exception now of the Fifth Circuit, one would think that this debate, which has resulted in a circuit-split, is a prime subject for review by the Supreme Court.

(C) *A Historical Review of the Second Amendment's Prefatory Clause: "A Well Regulated Militia Being Necessary to the Security of a Free State"*

An accurate understanding of the origins of the term "militia," as used in the Second Amendment, is critical to an understanding of the proper scope of the Amendment's language which speaks about "the right of the people to keep and bear arms ...." U.S. Const. amend. II. This Court, like the *Silveira* Court, finds the traditional individual rights position that was embraced by the *Emerson* Court to be fatally flawed in that it misconceives the meaning of the term "militia." In assessing what constitutes the militia within the context of the Amendment, the *Emerson* Court found insightful the Supreme Court's observation in *Miller* that " 'the Militia comprised all males physically capable of acting in concert for the common defense' and 'that ordinarily when called for service these men were expected to appear bearing arms supplied by themselves.'" *Emerson,* 270 F.3d at 234 (quoting *Miller,* 307 U.S. at 179, 59 S.Ct. 816). The *Emerson* Court further noted that *Miller* states that " '[i]n all the colonies ... the militia systems ... implied the general obligation of all adult male inhabitants to possess arms.'" *Id.* (quoting *Miller,* 307 U.S. at 179, 59 S.Ct. 816). The

court then pointed out that "[t]here are frequent contemporaneous references to 'a well-regulated militia' being 'composed of the body of the people, trained in arms.'" *Id.* From these passages, the *Emerson* Court concluded that "'a well-regulated militia' refers *not* to a special or select subset or group taken out of the militia as a whole ...." *Id.* (footnote omitted). Based on this assessment, the *Emerson* Court, like the traditional individual rights advocates, reasoned that because the term "militia" refers to individuals, the Second Amendment guarantees individuals, including those who are not part of the militia or other military service, a fundamental right to possess firearms subject to reasonable regulation by the government. *Id.* at 260.

The Court is unable to agree with this position because, like the Ninth Circuit in *Silveira*, 312 F.3d at 1069–70, it finds that the term "militia," as used in the Second Amendment, is clearly referencing a state military body. Perhaps the best evidence of this lies in Article I of the Constitution, which discusses the powers of Congress. As the *Miller* Court explained, under Article I,

> [t]he Constitution as originally adopted granted to the Congress power—'To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, *reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.*'

307 U.S. at 178, 59 S.Ct. 816 (emphasis added) (quoting U.S. Const. art. I, § 8, cl. 15–16 ("Militia Clauses")). It is apparent from Article I that the Constitution establishes dual control over the militias, as they were intended to be "essentially organized and under control of the states, but subject to regulation by Congress and to 'federalization' at the command of the President." *Silveira*, 312 F.3d at 1070 (citation omitted). This Court's conclusion that the term "militia" refers to a state military entity is further supported by "the drafters of the Constitution's predecessor document, the Articles of Confederation." *Id.* at 1071. The Articles of Confederation "provided that 'every state shall always keep up a well regulated and disciplined militia, sufficiently armed and accoutered, and shall provide and constantly have ready for use, in public stores, a due number of field pieces and tents, and a proper quantity of arms, ammunition and camp equipage.'" *Id.* (quoting *The Articles of Confederation* art. 6 (1777), *in Documents of American History* 112 (Henry Steele Commager ed., 7th ed.1963)). Thus, the Articles provide further evidence that a "militia" was understood to be a state military entity. Moreover, and of particular significance to the Court's opinion about the meaning of the term "militia" is the Ninth Circuit's discussion in *Silveira* about the reasons underlying the inclusion of the phrase "necessary to the security of a free State" in the Second Amendment.

> "This choice of language was far from accidental: [James] Madison's first draft of the amendment stated that a well-regulated militia was 'the best security of a free country.' Anti–Federalist Elbridge Gerry explained that changing the language to 'necessary to the security of a free State' emphasized the primacy of the state militia over the federal standing army: 'A well-regulated militia being the best security of a free state, admitted an idea that a standing army was a secondary one.'"

*Id.* (citing David Yassky, *The Second Amendment: Structure, History and Constitutional Change,* 99 Mich. L.Rev. 588, 610 (2000) (quoting The Congressional Register, August 17, 1789)). As this Court will more fully explore below in subsection E, *infra* at 232–35, it is apparent that the phrase "a well regulated militia" in the Second Amendment refers to the maintenance of an effective state fighting force, which was specifically included by the drafters of the Bill of Rights to protect the states against a potentially oppressive federal government. It was only through strong state militias that the drafters believed the people of our nation could be secure in the blessings of liberty and no longer fear a tyrannical federal government which had a standing army at its disposal.

**(D)** ***A Historical Review of the Second Amendment's Clause: "The Right of the People to Keep and Bear Arms, Shall Not Be Infringed."***

As support for their position that the Second Amendment grants individuals a fundamental right to possess firearms, proponents of the traditional individual rights approach tend to focus on the Second Amendment's latter clause, which states: "the right of the people to keep and bear arms, shall not be infringed." This Court concludes that advocates of the traditional individual rights approach mistakenly rely on this clause as support for their position because, like the Ninth Circuit, the Court finds it "highly significant ... that the second clause does not purport to protect the right to 'possess' or 'own' arms, but rather to 'keep and bear' arms. This choice of words is important because the phrase 'bear arms' is a phrase that customarily relates to a military function." *Id.* at 1072.

Both the *Emerson* and *Silveira* Courts recognized that the most significant judi-

cial decision in defining the term "bear arms" is the Tennessee Supreme Court's decision in *Aymette,* which as this Court indicated above was cited by the *Miller* Court. *See Silveira,* 312 F.3d at 1073 ("The Tennessee Supreme Court, in the most significant judicial decision to construe the term 'bear arms' ...."); *Emerson,* 270 F.3d at 229–30 ("The best evidence that 'bear arms' was primarily used to refer to military situations comes from *Aymette* ...."). As already explained above, in considering the defendant's constitutional challenge to the Tennessee statute prohibiting the wearing of a concealed bowie-knife, the *Aymette* Court stated that the Tennessee constitutional provision that protected "the free white men of [the] State [to] have a right to keep and bear arms for their common defen[s]e" was adopted for the same reason the Second Amendment was adopted: to permit the people not "for [their] private defen[s]e, but, being armed, they may *as a body* rise up to defend their just rights, and compel their rulers to respect the laws." 21 Tenn. 154, 1840 WL 1554, at *2 (emphasis added). The *Aymette* Court explained that

> [t]he words 'bear arms,' too, have reference to their military use .... As the object for which the right to keep and bear arms is secured is of general and public nature, to be exercise by the people in a body ... so the arms the right to keep which is secured are such as are usually employed in civilized warfare, and that constitute the ordinary military equipment. If the citizens have these arms in their hands, they are prepared in the best possible manner to repel any encroachments upon their rights by those in authority. They need not, for such a purpose, the use of those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the as-

sassin. These weapons would be useless in war.

*Id.* at *3. The *Aymette* Court concluded its discussion of the term "bear arms" by stating:

> To make this view of the case still more clear, we may remark that the phrase, 'bear arms,' is used in the Kentucky constitution as well as in our own, and implies, as has already been suggested, their military use.... A man in the pursuit of deer, elk, and buffaloes might carry his rifle every day for forty years, and yet it would never be said of him that he had borne arms; much less could it be said that a private citizen bears arms because he has a dirk or pistol concealed under his clothes, or a spear in a cane.

*Id.* at *5.

The *Silveira* Court also noted that the first version of the Second Amendment proposed by James Madison "concluded with an exemption from 'bearing arms' for the 'religiously scrupulous.'" 312 F.3d at 1073 (citing *The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 169 (Neil H. Cogan ed., 1997)).[19] The original version proposed by Madison read: "The right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country: but no person religiously scrupulous of bearing arms, shall be compelled to render military service in person." *The Complete Bill of Rights* at 169 (quoting *Congressional Register,* June 8, 1789, vol. 1, p. 427). The Ninth Circuit noted that "[h]istorians have observed that '[n]o state at the time, nor any state before, had ever compelled people to carry weapons in their private capacity.'" *Silveira,* 312 F.3d at 1073–74

(quoting Paul Finkelman, *"A Well Regulated Militia": The Second Amendment in Historical Perspective,* 76 Chi.-Kent L.Rev. 195, 228 (2000)). Thus, although the religious exemption provision was not incorporated into the final version of the Amendment, Madison's attempt to include it, reflects the thoughts of the primary drafter of the Second Amendment. On this point, the Ninth Circuit concluded that

> the exemption from bearing arms for the religiously scrupulous can only be understood as an exemption from carrying arms in the service of a state militia, and not from possessing arms in a private capacity. Otherwise, Madison's insertion of the religiously-scrupulous exception in the first draft of the present amendment would have made no sense at all.

*Id.* at 1074.

Acknowledging that "[t]here is no question that the phrase 'bear arms' may be used to refer to the carrying of arms by a soldier or militiaman[,]" the *Emerson* Court proceeded instead to recast the issue as whether this term "was also commonly used to refer to the carrying of arms by a civilian." 270 F.3d at 229–32. This Court, however, is unable to agree with this proposition. The *Aymette* Court was clear that the "phrase ... 'bear arms' ... implies ... [a] military use" and an individual that carries or possesses a weapon for a private, *i.e.,* non-military, purpose does not "bear arms." 21 Tenn. 154, 1840 WL 1554, at *5. Accordingly, this Court must conclude that the term "bear arms" only has a military connotation.

While it is this Court's view that the inclusion of the term "bear arms" in the clause—"the right of the people to keep

---

19. This has been referred to in modern day parlance as a conscientious objector provi-

sion. *Silveira,* 312 F.3d at 1085.

and bear arms"—clearly refers to the carrying of arms in the military context, the inclusion of the term "keep" has perplexed historians. *Silveira*, 312 F.3d at 1074 ("The reason why the term was included in the amendment is not clear."); *Emerson*, 270 F.3d at 232 (noting that the government and amici did not argue that the term "keep" has a military connotation, but providing no substantive discussion on this issue). Although there is little historical discussion on the inclusion of the word "keep" in the Second Amendment, this Court finds it noteworthy that some historians "have suggested that 'keep and bear' must be construed together (like 'necessary and proper') as a unitary phrase that relates to the maintenance of arms for military service." *Silveira*, 312 F.3d at 1074 (citing Michael C. Dorf, *What Does the Second Amendment Mean Today?*, 76 Chi.-Kent L.Rev. 291, 317 (2000)). Moreover, others

> have noted that the right of the states to 'keep' arms was a catalyst for the Revolution—it was the British troops' attempts to capture the Massachusetts militia's arsenal that prompted Paul Revere's warning and the battles at Lexington and Concord to defend the state's stores of munitions. Accordingly, the ability of states to 'keep' arms for military use without external interference undoubtedly was prominent in the minds of many founders.

*Id.* (citing Finkelman, *supra*, at 234). Thus, while the individual rights advocates focus on the latter clause of the Second Amendment as support for their position, the Court finds that this clause does not provide support for the position that the Second Amendment somehow provides for an individual right to possess firearms.

**(E)** ***The Historical Context of the Second Amendment's Enactment***

A review of the historical context underlying the enactment of the Second Amendment supports the view that it was included in the Bill of Rights to ensure that the states would have an effective military force, not only to provide support for the federal government in times of certain specified national emergencies, *see* U.S. Const. art. I, § 8, cl. 15, but also to ensure that the people would have the ability to defend themselves against a potentially oppressive federal government. The Constitution and Bill of Rights were enacted following a bitter war with Great Britain, at a time when the American people had grave concerns about the existence of standing armies. *Silveira*, 312 F.3d at 1076–77 (citing Dorf, *supra*, at 308). Citing Adam Smith's Wealth of Nations, the Supreme Court commented in *Miller*, in discussing the need for a militia, that "[m]en of republican principles have been jealous of a standing army as dangerous to liberty." 307 U.S. at 179, 59 S.Ct. 816. In fact, "one of the principal complaints listed in the Declaration of Independence was that King George III 'has kept among us, in times of peace, Standing Armies without the Consent of our legislatures. He has affected to render the Military independent of and superior to the Civil power.'" *Silveira*, 312 F.3d at 1076–77 (quoting *The Declaration of Independence* ¶ 2 (U.S. 1776)). After noting the dual control of the militia in the Constitution's Militia Clauses, the Supreme Court in *Miller* commented that "[t]he sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia—civilians primarily, soldiers on occasion." 307 U.S. at 179, 59 S.Ct. 816.

In the Articles of Confederation, which were in effect from 1781–1789, "[t]he bulwark of the national defense was the state militias, which bodies the states could vol-

untarily contribute to the services of the Confederation. The states retained the sole power to arm and otherwise to maintain their respective militias." *Silveira,* 312 F.3d at 1077 (citing *The Articles of Confederation, supra,* art. 6 ("[E]very state shall always keep up a well regulated and disciplined militia, sufficiently armed and accoutered, and shall provide and constantly have ready for use, in public stores, a due number of field pieces and tents, and a proper quantity of arms, ammunition and camp equipage.")). It is interesting that during the time when the Articles of Confederation were in existence, some of the states assumed the responsibility for arming their own militias, while other states required that individual militiamen bring their own arms for militia service. *Id.* at 1077 n. 36. However, many of our founding fathers saw that the governmental system under the Articles of Confederation as flawed in many respects, including its omission of a national military force. *Id.* at 1078. In fact, in a letter to John Adams, George Washington wrote that "in the wake of Shays's Rebellion [and] the lack of a unified military force, '[w]e are fast verging to anarchy and confusion!'" *Id.* at 1078 n. 37 (quoting Letter from George Washington to James Madison (Nov. 5, 1786), *in* 29 *The Writings of George Washington,* 1745–1799, at 51 (John Clement Fitzpatrick ed., 1931)). A movement ultimately emerged for "[t]he establishment of a national armed force[, which] was one of the primary reasons that the Constitutional Convention in 1787 was convened." *Id.* at 1078. A review of "[t]he minutes of the proceedings of the Constitutional Convention reveal that the delegates to the convention devoted substantial efforts to determining the proper balance between state and federal control of military matters." *Id.* (citing Yassky, *supra,* at 599). As the Supreme Court explained in *Perpich v. Department of De-*

*fense,* 496 U.S. 334, 110 S.Ct. 2418, 110 L.Ed.2d 312 (1990),

"[t]wo conflicting themes, developed at the Constitutional Convention and repeated in debates over military policy during the next century, led to a compromise in the text of the Constitution and in later statutory enactments. On the one hand, there was a widespread fear that a national standing Army posed an intolerable threat to individual liberty and to the sovereignty of the separate States, while, on the other hand, there was a recognition of the danger of relying on inadequately trained soldiers as the primary means for providing for the common defense. Thus, Congress was authorized both to raise and support a national Army and also to organize 'the Militia.'"

*Id.* at 340, 110 S.Ct. 2418. The Ninth Circuit noted that

[t]he provision that most troubled the Anti–Federalists, and that prompted the most strident calls for amendment to the proposed constitution, was the one that authorized Congress to provide arms to the militias. The disagreement among the delegates arose not over whether Congress should be able to arm the militias at all, but over whether that power should be exclusive or concurrent with a state power to provide such arms—as well as over how other responsibilities for the militias should be distributed between the state and federal governments.

*Silveira,* 312 F.3d at 1079 (citing *Perpich,* 496 U.S. at 340, 110 S.Ct. 2418). Following the conclusion of the Constitutional Convention and the ratification of the Constitution, the First Congress met in New York in April of 1789. *Id.* at 1084, 110 S.Ct. 2418. In direct response to efforts by the Anti–Federalists to change the new Constitution, James Madison introduced

"twelve proposed amendments soon after the new legislature convened." *Id.* (citation omitted). Among the many proposals by the Anti–Federalists to stymy the powers of the new national government, were calls for "limit[ations] on the national army, as well as on the authority of the federal government to call the state militia into federal service." *Id.* at 1084 n. 50, 110 S.Ct. 2418. The Anti–Federalists feared that "federal power [could be used] to call forth state militias ... lead[ing] to one state's militia being turned against another's, and that the federal government would force state militias to march to far-flung corners of the nation." *Id.* (citing Yassky, *supra*, at 607). The *Silveira* Court found that

> [t]he debates of the First Congress regarding Madison's proposed Second Amendment, like the debates at the Constitution's ratifying conventions, support the view that the amendment was designed to ensure that the people retained the right to maintain effective state militias, the members of which could be armed by the states as well as by the federal government. Otherwise, the anti-Federalists feared, the federal government could, by inaction, disarm the state militias (and thus deprive the people of the right to bear arms).

*Id.* at 1085. The Ninth Circuit went on to note that

> [n]o one in the First Congress was concerned, however, that federal marshals might go house-to-house taking away muskets and swords from the man on the street or on the farm. Notably, *there is not a single statement in the*

> *congressional debate about the proposed amendment that indicates that any congressman contemplated that it would establish an individual right to possess a weapon.*

*Id.* (citing Jack N. Rakove, *The Second Amendment: The Highest Stage of Originalism*, 76 Chi.-Kent L.Rev. 103, 210–11 (2000)).[20] Instead, as discussed above, *see infra*, at 231, the debates in the First Congress on the Second Amendment focused on a conscientious objector provision contained in the first version of the Amendment proposed by James Madison, which "concluded with an exemption from 'bearing arms' for the 'religiously scrupulous.'" 312 F.3d at 1073, 1085 (citations omitted). The Ninth Circuit observed:

> The fact that the overwhelming majority of the debate regarding the proposed Second Amendment related to the conscientious objector provision demonstrates that the congressmen who adopted the amendment understood that it was concerned with the subject of state militias. A right not to bear arms due to conscientious objection can *only* mean a right not to be compelled to carry arms that the government seeks to make one bear—to perform military service that one is unwilling to perform. There is no possible relevance of the term 'conscientious objection' to a constitutional amendment guaranteeing a private right to possess firearms. Thus, if the Second Amendment was in fact designed to establish an individual right, the debate over the conscientious objec-

---

**20.** In fact, the *Silveira* Court noted that

in other public fora, some of the framers explicitly disparaged the idea of creating an individual right to personal arms. For instance, in a highly influential treatise, John Adams ridiculed the concept of such a right, asserting that the general availability

of arms would 'demolish every constitution, and lay the laws prostrate, so that liberty can be enjoyed by no man—it is a dissolution of the government.'

312 F.3d at 1085 (quoting 3 John Adams, *A Defence of the Constitutions of Government of the United States* 475 (1787)).

tor provision would have been entirely purposeless. *Id.* at 1085–86. Finally, the Court finds it significant that in his efforts to convince the people of the advantages of the Constitution in The Federalist Papers, James Madison noted that although the federal government had a standing army, the people would have the use of militias, stating:

> Let a regular army, fully equal to the resources of the country, be formed; and let it be entirely at the devotion of the federal government: still it would not be going too far to say that the State governments with the people on their side would be able to repel the danger. .... Besides the advantage of being armed, which the Americans possess over the people of almost every other nation, the existence of subordinate governments, to which the people are attached and by which the militia officers are appointed, forms a barrier against the enterprises of ambition, more insurmountable than any which a simple government of any form can admit of.

*Id.* at 1079–80 (quoting *The Federalist* No. 46, at 267 (Clinton Rossiter ed., 1961)). ▮▮▮ For the aforementioned reasons, this Court finds that the Second Amendment was adopted to ensure the effectiveness of state militias as protectors of the states, and thus the people, from the potential of an oppressive national government. Accordingly, the Court must conclude that the Second Amendment does not confer an individual a right to possess firearms. Rather, the Amendment's objective is to ensure the vitality of state militias. Having concluded that the traditional individual rights model does not withstand a contextual and historical analysis of the Second Amendment, this Court needs not determine whether the Amendment protects the rights of individual state militia members to possess firearms to resolve the issues raised in this case. This determination does not have to be made because, as the Court will explain below, the Second Amendment's scope does not extend to the District of Columbia, but, even if it did, plaintiff Hailes has failed to assert that she is part of the District of Columbia's militia and therefore has a right to possess firearms as a result of such membership.

### (F) *Does the Second Amendment Apply to the District of Columbia and, if it Does, Does It Apply to the Plaintiff in this Case?*

This Court finds that the circumstances of this case are distinct from all of the cases that have addressed the Second Amendment in one significant respect. All of those cases involved challenges by state citizens, whereas here, the challenges are being made by District of Columbia residents. The District of Columbia, which does not occupy state status, is a uniquely designed governmental entity, whose powers are vested in Congress, which in turn has delegated some of its authority over District of Columbia affairs to the congressionally created local government system. *See* D.C.Code §§ 1–201 *et seq.* This dual control over the affairs of the District of Columbia is particularly unique in the context of the current Second Amendment debate. On one hand, the District of Columbia has a general prohibition against the possession of pistols by residents of the District, *see* D.C.Code § 7–2502, and the United States Attorney's Office for the District of Columbia, which is charged with prosecuting violations of this statute along with the Corporation Counsel's Office of the District of Columbia, strictly enforces this firearms proscription. On the other hand, the United States Department of Justice, which has ultimate authority over the

United States Attorney's Office, has now taken the position that the Second Amendment protects an individual's fundamental right to possess firearms. *See* Att'y Gen.'s Mot. at 13 n. 11. This conflict between existing District of Columbia law and the Department of Justice's current position, along with the Fifth Circuit's decision in *Emerson*, has led to a number of challenges to the District's legislation prohibiting the possession of firearms by defendants being prosecuted in the Superior Court of the District of Columbia. *See, e.g., United States v. Freeman,* Cr. No. F–1048–02 (D.C.Super.Ct.2002) (Keary, J.) (denying defendant's motion to dismiss the indictment charging him with carrying a pistol without a license, possession of an unregistered firearm, and possession of ammunition, as violations of his rights under the Second, Fifth and Fourteenth Amendments and finding that the Second Amendment protects "only a collective, rather than an individual right, to bear arms").

### (i) *Does the Second Amendment Apply to the District of Columbia?*

In *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), the Supreme Court commented that

[t]he District of Columbia ... 'is an exceptional community ... established under the Constitution as the seat of the National Government.' *District of Columbia v. Murphy,* 314 U.S. 441, 452, 62 S.Ct. 303, 86 L.Ed. 329 (1941). As such, it 'is as lasting as the states from which it was carved or the union whose permanent capital it became.' *O'Donoghue v. United States,* 289 U.S. 516, 538, 53 S.Ct. 740, 77 L.Ed. 1356 (1933). Indeed, it is 'the very heart—of the Union itself, to be maintained as the 'permanent' abiding place of all its supreme departments, and within which the immense

powers of the general government were destined to be exercised ....' *Id.* at 539, 53 S.Ct. 740. Unlike either the States or Territories, the District is truly sui generis in our governmental structure.

*Id.* at 432, 93 S.Ct. 602. The Constitution provides for the creation of the District of Columbia in Article I, which grants Congress the power

[t]o exercise exclusive Legislation in all Cases whatsoever, over such District (no exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places, purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock Yards, and other needful Buildings.

U.S. Const. Art. I, § 8, cl. 17. Thus, the *Carter* Court commented that

while Congress was unable to exert any direct control over the actions of state officials, it was authorized under Art. I, § 8, cl. 17, of the Constitution to exercise plenary power over the District of Columbia and its officers. Indeed, '(t)he power of Congress over the District of Columbia includes all the legislative powers which a state may exercise over its affairs.'

409 U.S. at 429, 93 S.Ct. 602 (quoting *Berman v. Parker,* 348 U.S. 26, 31, 75 S.Ct. 98, 99 L.Ed. 27 (1954)). However, "[i]n 1973, Congress delegated the bulk of this authority to the District by passing the Home Rule Act, Pub.L. No. 93–198, 87 Stat. 774 (1973) (codified as amended at D.C.Code §§ 1–201 *et seq.*)." *Bliley v. Kelly,* 23 F.3d 507, 508 (D.C.Cir.1994). The Home Rule Act places certain limitations and reservations on this delegation of authority, which are chiefly contained in

sections 1–206.01 and 1–206.02 of the District of Columbia Code. First, Congress has reserved to itself the authority to enact "legislation for the District on any subject ... including legislation to amend or repeal any law in force in the District ... and any act passed by the [District of Columbia] Council." D.C.Code § 1–206.01. Second, Congress has also reserved the authority to veto any legislation enacted by the District of Columbia Council, legislating in section 1–206.02(c)(1) that:

> the Chairman of the Council shall transmit to the Speaker of the House of Representatives, and the President of the Senate, a copy of each act passed by the Council and signed by the Mayor .... [S]uch act shall take effect upon the expiration of the 30–calendar–day period (excluding Saturdays, Sundays, and holidays, and any day on which neither House is in session because of an adjournment sine die, a recess of more than 3 days, or an adjournment of more than 3 days) beginning on the day such act is transmitted by the Chairman to the Speaker of the House of Representatives and the President of the Senate, or upon the date prescribed by such act, whichever is later, unless during such 30–day period, there has been enacted into law a joint resolution disapproving such act.

D.C.Code § 1–206.02(c)(1). The *Bliley* Court aptly summarized the legislative process under the Home Rule Act, stating that it provides "Congress a layover period of thirty statutory days to review legislation submitted by the D.C. Council. If Congress fails to pass a joint resolution of disapproval within that period, the legislation becomes law." [21] 23 F.3d at 508. Thus, while Congress delegated a substantial portion of its legislative authority to the District of Columbia Council, it always maintains final control over all legislation adopted for the District of Columbia. One final point that bears mentioning is that section 1–206.02 contains a provision which states that "[n]othing in this chapter shall be construed as vesting in the District government any greater authority over ... the National Guard of the District of Columbia ... or ... over any federal agency, than was vested in the Commissioner prior to January 2, 1975." D.C.Code § 1–206.02(b).

With this background in mind, the Court will examine whether the Second Amendment is applicable to the District of Columbia, because it is patently clear that only certain statutory and constitutional provisions apply to the District of Columbia. Thus, for example, in *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), the Supreme Court held that the Fourteenth Amendment does not apply to the District of Columbia. And, in *Carter*, the Supreme Court was faced with deciding whether the plaintiff could assert a civil rights claim against the District of Columbia's Metropolitan Police Department under 42 U.S.C. § 1983. 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613. Holding "that the District of Columbia is not a

---

**21.** And this is what happened regarding the District of Columbia statutes that are being challenged by the plaintiffs here. As explained by the District of Columbia Court of Appeals in *McIntosh v. Washington*, 395 A.2d 744 (D.C.1978),

> [o]n June 26, 1976, the District of Columbia Council [ ] enacted the Firearms Control Regulations Act of 1975 (the Act or the Firearms Act). The legislation was signed

by the Mayor on July 23, 1976, and was sent to Congress for a 30–day review in accordance with ... [the Home Rule Act]. Resolutions to disapprove the Firearms Act were introduced in the House of Representatives, but were unsuccessful; consequently, the Act became effective ... on September 24, 1976.

*Id.* at 746 (internal citations omitted).

'State or Territory' within the meaning of § 1983," the Court stated:

Whether the District of Columbia constitutes a 'State or Territory' within the meaning of any particular statutory or constitutional provision depends upon the character and aim of the specific provision involved. Indeed, such '(w)ords generally have different shades of meaning, and are to be construed if reasonably possible to effectuate the intent of the lawmakers; and this meaning in particular instances is to be arrived at, not only by a consideration of the words themselves, but by considering, as well the context, the purposes of the law, and the circumstances under which the words were employed.'

*Id.* at 420, 93 S.Ct. 602 (citations omitted).

In reviewing challenges to the District of Columbia's Firearms Control Regulations Act, the local courts have assumed that the Second Amendment applies to the District of Columbia. For example, in *Sandidge v. United States,* 520 A.2d 1057 (D.C.1987), the District of Columbia Court of Appeals concluded that "assuming the second amendment applies to the District of Columbia, we hold it affords appellant no protection whatsoever since congressionally approved criminal law does not interfere with any government-created right to keep and bear arms." *Id.* at 1058. In his concurring opinion in *Sandidge,* Judge Nebeker stated:

I write separately to state my conclusion that the second amendment does not apply to the seat of national government. This amendment is to ensure 'the security of a free State.' State militias were essential to that end—hence, the amendment. Nothing suggests that the founders were concerned about 'free territories,' 'free protectorates' or a 'free Seat of Government of the United States.' Indeed clause 17 gives to Congress exclusive legislative power in all cases over such 'District.' It may fairly be said that a federal militia is available in such places. Therefore, whatever may be said for the second amendment and its reach within the several states, I conclude first that it does not apply to the Seat of Government of the United States.

*Id.* at 1059 (Nebeker, J., concurring). This Court agrees with Judge Nebeker and therefore concludes that the Second Amendment does not apply to the District of Columbia.

As fully set forth above, the intent of the framers of the Second Amendment was to ensure the efficiency of state militias so they could protect the "security of a free State ...." U.S. Const. amend. II. Because this Court must look to the "character and aim" of the Second Amendment to determine whether it was intended for the District of Columbia to fall within the ambit of the Amendment, *see Carter,* 409 U.S. at 420, 93 S.Ct. 602, the aforementioned discussion of the Second Amendment's scope was a necessary predicate. And, as the Court explained above, the Second Amendment was included in the Bill of Rights to ensure that the people would have the ability to defend themselves against a potentially oppressive federal government, which had just been given the authority to maintain a national standing army in Article I of the Constitution. But, the drafters of the Constitution having provided for a "District ... [to] become the Seat of the Government of the United States," U.S. Const. Art. I, § 8, cl. 17, and having given Congress "exclusive" authority both to legislate over this District *and to exercise control over "the Erection of Forts, Magazines, [and] Arsenals ...," id.* (emphasis added), surely it was not intended for the protection afforded by the Sec-

ond Amendment to apply to an entity that had been created to house the national seat of government. In other words, there is no reason to believe that the First Congress thought that the federal seat of government needed to be protected from itself when the Second Amendment was adopted. *See Silveira,* 312 F.3d at 1076–86 (discussing the concerns that led the First Congress to enact the Second Amendment).

Interestingly, even the *Emerson* Court began its analysis of the judicial history of Second Amendment jurisprudence by citing the Supreme Court's decision in *Cruikshank,* which had held that the Second Amendment "is one of the amendments that has no other effect than to restrict the powers of the National Government." *Emerson,* 270 F.3d at 221–22 n. 13 (quoting *Cruikshank,* 92 U.S. at 553, 92 U.S. 542). In addition, the Fifth Circuit acknowledged that subsequent Supreme Court cases have reaffirmed the *Cruikshank* holding. *Id.* (citing *Miller v. Texas,* 153 U.S. 535, 14 S.Ct. 874, 38 L.Ed. 812 (1894) (holding that with respect to "the second and fourth amendments" that "the restrictions of these amendments operate only upon the federal power, and have no reference whatever to proceedings in state courts"); *Presser,* 116 U.S. 252, 6 S.Ct. 580 (finding that the Second "amendment is a limitation only upon the power of congress and the national government, and not upon that of the state.")). However, the *Emerson* Court, in an effort to mitigate the significance of rather strong language by the Supreme Court that this Court construes as inconsistent with the conclusion reached by the Fifth Circuit, concluded:

> As these holdings [*Cruikshank, Presser* and *Miller*] all came well before the Supreme Court began the process of incorporating certain provisions of the first eight amendments into the Due Process Clause · of the Fourteenth

Amendment, and as they ultimately rest on a rationale equally applicable to all those amendments, none of them establishes any principle governing any of the issues now before us.

270 F.3d at 222 n. 13. In any event, while the Fifth Circuit had to cast a shadow on the current viability of Supreme Court precedent that have commented on the scope of the Second Amendment to reach the conclusion that the Second Amendment protects an individual right to possess firearms, the *Emerson* Court's assessment is of no moment here because, as noted above, the Fourteenth Amendment does not apply to the District of Columbia. *Bolling,* 347 U.S. 497, 74 S.Ct. 693. Accordingly, this Court concludes that the District of Columbia is not a state within the meaning of the Second Amendment and therefore the Second Amendment's reach does not extend to it. Thus, even if this Court were to find that there was support for the proposition that the Second Amendment protects the right of individual state militia members to possess firearms (*i.e.,* the "limited individual rights" or "sophisticated collective rights" model), because the Court concludes that the District of Columbia is not a state for Second Amendment purposes, plaintiff Hailes would not have standing to challenge D.C.Code § 7–2507.02 based on her association with a District of Columbia militia.

### (ii) *Does the Second Amendment Apply to the Plaintiff in this Case?*

Finally, the Court notes that even if it could conclude that the Second Amendment applies to the District of Columbia, plaintiff Hailes would nonetheless be unable to assert that she has a right to possess her firearm in her residence in the manner in which she desires (*i.e.,* assembled and without a trigger lock) because

she has failed to assert any form of association with a militia. *See Silveira*, 312 F.3d at 1060 (describing the school of thought that limits the right to bear arms as conditioned on membership in a militia as the "limited individual rights" model); *Emerson*, 270 F.3d at 219 (describing this school of thought as the "sophisticated collective rights" model). A brief review of the history of the militia is a necessary predicate to addressing why Ms. Hailes is unable to assert a right to possess her firearm without restrictions under the limited individual rights or sophisticated collective rights models.

In *Perpich*, the Supreme Court explained that

> [i]n 1792, [Congress] pass[ed] a statute that purported to establish 'an Uniform Militia throughout the United States,' but its detailed command that every able-bodied male citizen between the ages of 18 and 45 be enrolled therein and equip himself with appropriate weaponry was virtually ignored for more than a century, during which time the militia proved to be a decidedly unreliable fighting force. The statute was finally repealed in 1901. It was in that year that President Theodore Roosevelt declared: 'Our militia law is obsolete and worthless.'

496 U.S. at 341, 110 S.Ct. 2418 (quoting First Annual Message to Congress, Dec. 3, 1901, 14 Messages and Papers of the Presidents 6672). Following President Roosevelt's observations, Congress passed the

> Dick Act[, which] divided the class of able-bodied male citizens between 18 and 45 years of age into an 'organized militia' to be known as the National Guard of the several States, and the remainder of which was then described as the 'reserve militia,' and which later

statutes have termed the 'unorganized militia.'

*Id.* at 342–43 & n. 11, 110 S.Ct. 2418 (citing 32 Stat. 775 (1903)). Specifically, the Dick Act provides

> [t]hat the militia shall consist of every able-bodied male citizen of the respective States, Territories, and the District of Columbia ... who is more than eighteen and less than forty-five years of age, and shall be divided into two classes—the organized militia, to be known as the National Guard of the State, Territory, or District of Columbia ... and the remainder to be known as the Reserve Militia.

*Id.* (quoting 32 Stat. 775 (1903)). The Supreme Court commented that "[i]t is undisputed that Congress was acting pursuant to the Militia Clauses of the Constitution in passing the Dick Act." *Id.* at 342, 110 S.Ct. 2418.

The District of Columbia has a unique statutory organizational scheme for its militia. Section 49–401 of the District of Columbia Code provides that:

> Every able-bodied male citizen resident within the District of Columbia, of the age of 18 years and under the age of 45 years, excepting persons [exempt by the general laws of the United States], and idiots, lunatics, common drunkards, vagabonds, paupers, and persons convicted of any infamous crime, shall be enrolled in the militia ....

D.C.Code § 49–401 (2001). And section 49–406 of the District of Columbia Code provides: "The organized militia shall be composed of volunteers, and shall be designated the National Guard of the District of Columbia." D.C.Code § 49–406 (2001). Pursuant to these provisions, presumably all District of Columbia male residents who have not volunteered for the National Guard and satisfy the qualifications of D.C.Code § 49–401 comprise the unorga-

nized or reserve militia. What is unique about the District of Columbia militia statutory scheme is that while the Constitution's Militia Clauses establish dual control over the states' militias, as they were to be "essentially organized and under control of the states, but subject to regulation by Congress and to 'federalization' at the command of the President[,]" *Silveira,* 312 F.3d at 1070, the District of Columbia Code vests control of the District of Columbia's organized militia (*i.e.,* the national guard) almost exclusively with the Executive Branch of the federal government. Section 49–409 of the District of Columbia Code provides that "[t]he President of the United States shall be the Commander–in–Chief of the militia of the District of Columbia." D.C.Code § 49–409 (2001). The President of the United States, as Commander–in–Chief of the militia, "shall ... appoint[ ] ... a Commanding General of the militia of the District of Columbia with the rank of brigadier general, or major general, who shall hold office until his successor is appointed and qualified, but may be removed at any time by the President." D.C.Code § 49–301(a) (2001). This "Commanding General of the militia of the District of Columbia shall be considered to be an employee of the Department of Defense, and of the United States ...." D.C.Code § 49–301(b). In addition, section 49–405 of the District of Columbia Code provides that the Commander–in–Chief has the authority to "call out any portion of the enrolled militia" as necessary and "may assign them to existing organizations of the active militia, or may organize them as the exigencies of the occasion may require." D.C.Code § 49–405 (2001). Moreover, it is significant that section 49–103 of the District of Columbia Code provides that

"When there is in the District of Columbia a tumult, riot, mob, or a body of men acting together by force with attempt to commit a felony or to offer violence to persons or property, or by force or violence to break and resist the laws, or when such tumult, riot, or mob is threatened, it shall be lawful for the Mayor of the District of Columbia ... to call on the Commander–in–Chief to aid them in suppressing such violence and enforcing the laws ...."

D.C.Code § 49–103 (2001). Finally, section 49–201 of the District of Columbia Code states that

[e]very organization of the National Guard shall be provided with such ordnance and ordnance stores, clothing, camp and garrison equipage, quartermaster's stores, medical supplies, and other military stores, as may be necessary for the proper training and instruction of the force and for the proper performance of the duties required under this chapter. Such property shall be issued from the stores and supplies appropriated for the use of the Army, upon the approval and by the direction of the Secretary of the Army, to the Commanding General, upon his requisitions for the same. The property so issued shall remain and continue to be the property of the United States, and shall be accounted for by the Commanding General at such times, in manner, and on such forms as the Secretary of the Army may require.

D.C.Code § 49–201 (2001). Thus, from these District of Columbia Code provisions, it is apparent that the organized militia of the District of Columbia, which is organized, armed, and controlled by the President of the United States, is essentially a component of the federal government.

In this case, Ms. Hailes does not assert in her Complaint or in her written response to a question on this issue posed by the Court during oral argument on the

motions currently before the Court, that she is a member of either the organized or reserve militias of the District of Columbia. Aside from her failure to plead standing based on her association with either of the militias, the record is devoid of any evidence that she is able to satisfy the essential elements to claim membership in the reserve militia of the District of Columbia.[22] *See* D.C.Code § 49–401. In any event, because she has the burden of establishing that the Court has jurisdiction, *see Grand Lodge of Fraternal Order of Police*, 185 F.Supp.2d at 13–14, and as she has failed to assert that she is a member of either the organized or reserve militias of the District of Columbia, she certainly cannot claim that the Second Amendment protects her right to possess her firearm without the requirements imposed by D.C.Code § 7–2507.02 because its possession is related to her association with a militia.

## IV. *Conclusion*

For the aforementioned reasons, this Court finds that the plaintiffs' challenges to sections 7–2502.02 and 22–4504(a) of the District of Columbia Code are non-justiciable due to the plaintiffs' lack of standing to make these challenges and the challenges not being ripe for adjudication.[23] On the other hand, the Court finds that plaintiff Hailes' challenge to the requirement that she maintain a trigger lock on her shotgun is legally distinct from the plaintiffs' other claims and therefore the Court had to analyze the scope and purpose of the Second Amendment to determine whether the D.C.Code § 7–2507.02 is unconstitutional.

Having done so, the Court finds that Ms. Hailes' Second Amendment challenge to D.C.Code § 7–2507.02 must also be dismissed, as the text of the Second Amendment, the history surrounding its enactment and Supreme Court precedent that have addressed the Amendment all lead the Court to the conclusion that Ms. Hailes' claims are not only lacking on the merits, but that the Second Amendment does not apply to the District of Columbia. Accordingly, the Court will dismiss this case.

---

**22.** The Court does not express an opinion on the constitutionality of this provision, as Ms. Hailes has not challenged D.C.Code § 49–401 on gender discrimination grounds.

**23.** The Court notes that all the reasons expressed herein with respect to why plaintiff Hailes does not have standing to make a

Second Amendment challenge to D.C.Code § 7–2507.02 would equally be applicable to why all of the plaintiffs also do not have standing to make a Second Amendment challenge to D.C.Code § 7–2502.02 and § 22–4504(a).